*Decision will be entered under Rule 50.*

AMERICAN LITHOFOLD CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3855-63. Filed March 16, 1971.

*John F. Kelly*, for the petitioner.
*George G. Young* and *Richard D. Worsley*, for the respondent.

HOYT, *Judge:* Respondent determined deficiencies in petitioner's income tax for the years 1950 and 1951 in the respective amounts of $78,187.09 and $181,244.66 and determined additions to tax under section 293(b) of the 1939 Internal Revenue Code [1] for the years 1950 and 1951 in the respective amounts of $39,093.55 and $201,314.74. In an amendment to his answer the respondent claimed an increased deficiency in income tax and an increased addition to tax for 1950 in the respective total amounts of $85,259.66 and $42,629.83. The increased deficiency for 1950 resulted from a change in position by respondent in his adjustment of a deduction item for the year 1949 which had the effect of reducing the net operating loss deduction for 1950 and, correspondingly, increasing the deficiency in income tax for that year. However, respondent at the trial conceded the 1949 deduction item and it is no longer before us.

In the amendment to his answer the respondent also claimed an increase deficiency in income tax for 1951 in the total amount of $209,-752.50 based upon the correction of mathematical errors made in the computation of the tax deficiency for that year in the statutory notice of deficiency. Respondent in his amended answer also corrected a mathematical error made in the statutory notice of deficiency in computing the addition to tax under section 293(b) for 1951 and claimed a corrected amount of $104,876.25 as an addition to tax for that year.

The issues remaining for decision are (1) whether petitioner overstated its cost of carbon paper purchased from the American Carbon Paper Corp. in the years 1950 and 1951 in the respective amounts of $44,478.13 and $101,621.43; (2) whether petitioner is entitled to deduct as ordinary and necessary business deductions under section 23(a)(1) certain travel expenses incurred by Robert J. Blauner in 1951 and 1952 in the respective amounts of $29,142.32 and $11,110.84; (3) whether petitioner is entitled to deduct as ordinary and necessary business expenses under section 23(a)(1) certain purported compensation payments to Karen K. Taylor in 1951 and 1952 in the respective amounts of $7,000 and $8,125; (4) whether petitioner is entitled to deduct as ordinary and necessary business expenses under section 23(a)(1) certain payments made to the Machinery Development Co. in 1949, 1950, 1951, and 1952 in the respective amounts of $14,547, $12,-636, $18,636, and $12,636; (5) whether any part of the deficiency for each of the years 1950 and 1951 is due to fraud with intent to evade tax within the meaning of section 293(b); and (6) whether the years 1950 and 1951 are barred by the statute of limitations.

---

[1] All section references will be to the 1939 Internal Revenue Code unless otherwise noted.

Petitioner has conceded several other issues raised by the pleadings and effect will be given to such concessions in the Rule 50 computation. Respondent's adjustments to petitioner's income for 1949 and 1952 are here involved because of their effect on the net operating loss deductions claimed by petitioner for the years 1950 and 1951.

FINDINGS OF FACT

Some of the facts were stipulated and they are herein included by this reference.

American Lithofold Corp., hereinafter called the petitioner, was organized in 1936 under the laws of Missouri. It filed its corporation income tax returns on an accrual basis for the years 1949 through 1952 with the then collector of internal revenue at St. Louis, Mo. Its principal place of business was in St. Louis, Mo. Throughout the years here involved the petitioner was engaged in the business of manufacturing and selling two principal types of business forms. One type, known as the litho set or snap out, consists of several leaves of record paper interleafed with one-time carbon paper. The second type is known as a continuous form which may contain many parts interleafed with one-time carbon paper and has marginally punched form-feeding holes.

American Carbon Paper Corp., hereinafter called American Carbon, was organized in 1943 under the laws of Illinois. Its principal place of business was in Chicago, Ill. Throughout the years here involved American Carbon was principally engaged in the business of manufacturing and selling one-time carbon paper which printers interleaf into business forms. It also manufactured and sold typewriter ribbons, boxed carbons, and related products. During the years here involved between 80 percent and 90 percent of the sales of American Carbon were to petitioner.

During the years 1949 through 1952 Robert J. Blauner and Antoinette E. Blauner were husband and wife. They had two children, Robert A. Blauner and Emlee B. Bridell. Robert J. Blauner died on June 4, 1966. During the years 1949, 1950, and part of 1951 Robert A. Blauner and Lorraine Blauner were husband and wife. They had two children, Robert A. Blauner, Jr., and Sally Blauner. Lorraine filed suit for divorce in March or April 1951 and the divorce was granted in September 1951. During the years 1949 through 1952 Albert M. Bridell and Emlee B. Bridell (Robert J. Blauner's daughter) were husband and wife. They had three children, Emlee Lorraine, Jessamine, and Robert.

In 1949 and 1950 W. F. Leschen (then the father-in-law of Robert A. Blauner) was president of the petitioner corporation and Robert J. Blauner was vice president and general manager. Robert J. Blauner became president of petitioner some time in 1951 and continued

as president until his death in 1966. During the years 1949 through 1952 Albert M. Bridell was president of American Carbon and Robert J. Blauner was treasurer.

As of December 31, 1949, 1950, and 1951, the petitioner corporation had common stock outstanding in the respective amounts of 4,103 shares, 4,108 shares, and 4,108 shares held by the following stockholders:

|  | Dec. 31, 1949 | Dec. 31, 1950 | Dec. 31, 1951 |
|---|---|---|---|
|  | *Percent* | *Percent* | *Percent* |
| R.J. Blauner and/or Antoinette E. Blauner | 29.12 | 29.09 | 39.65 |
| American Carbon Paper Corp | 14.65 | 21.86 | 23.20 |
| R. A. Blauner and/or Lorraine Blauner | 7.68 | 2.23 | |
| A. M. Bridell and/or Emlee B. Bridell | 6.34 | 5.98 | 5.98 |
| Trustee for children of R. A. Blauner | 0.07 | 0.07 | 0.07 |
| Others | 42.14 | 40.77 | 31.10 |
|  | 100 | 100 | 100 |

As of December 31, 1949 through 1952, the common stock shareholders of American Carbon were as follows:

|  | *Shares* |
|---|---|
| A. M. and Emlee Bridell | 26,800 |
| R. J. and Antoinette E. Blauner | 17,200 |
| R. J. Blauner, trustee for the children of A. M. and Emlee Bridell | 6,000 |
| R. J. Blauner, trustee for the children of R. A. and Lorraine Blauner | 4,000 |
| R. A. Blauner | 500 |
| Total shares | 54,500 |

During World War II the petitioner's principal customer was the U.S. Government. Most of the Government business came from petitioner's Washington, D.C., office and some of it came through petitioner's New York office. Both of these sales offices were under the management of Robert A. Blauner who was at that time a vice president of petitioner and its eastern division sales manager. Late in 1948 R. A. Blauner left the employ of petitioner but returned as eastern division sales manager in 1949 after an absence of about 6 months.

Petitioner's net sales for the years 1945 through 1951 and the portion of the net sales represented by Government sales during the same period were as follows:

| Year | Net sales | Government sales |
|---|---|---|
| 1945 | $3,236,136.98 | $2,669,000.00 |
| 1946 | 3,014,975.98 | 2,275,518.34 |
| 1947 | 2,454,887.53 | 662,894.82 |
| 1948 | 2,744,516.00 | 794,254.50 |
| 1949 | [1] 2,570,000.00 | 663,636.98 |
| 1950 | [2] 3,743,650.52 | 1,401,696.92 |
| 1951 | [1] 6,359,000.00 | 3,121,194.27 |

[1] Approximate.
[2] As reported by petitioner in its 1950 corporate income tax return.

In 1952 petitioner's net sales fell below $3,500,000. Its Government sales for 1952 were in the amount of $726,818.

On June 30, 1949, petitioner applied to the Reconstruction Finance Corporation for a loan of $500,000 for the following purposes: (1) Refund existing RFC loan, $219,611.46; (2) refund real estate loan on building, $38,386.65; (3) refund W. E. Heller & Co. loan on inventory and accounts receivable, $178,244.20; and (4) increase working capital, $63,757.69. On September 30, 1949, petitioner's application for loan was approved by the RFC in the reduced amount of $465,000 and on November 14, 1949, the RFC approved an additional $100,000. Petitioner received the proceeds of the loan in the amount of $565,000 in January 1950. In connection with the loan petitioner entered into a loan agreement with the RFC which provided for limitations on the payment of compensation to various employees. In the case of R. A. Blauner, his annual compensation was limited to $18,000 with the proviso that such amount would be increased by commissions and override if approved by the RFC. In August 1950 petitioner refinanced its obligation to the RFC by means of a mortgage loan and accounts receivable and inventory loan agreements with Walter E. Heller & Co.

In June or July 1950 Robert A. Blauner hired William J. Sims to run petitioner's office in Washington, D.C., and to handle the Government printing contracts. The only other employees of the office at that time were Geraldine E. Mulhollen, who performed general office work, and George Deering, who worked only for a short period. In handling Government sales, Sims received requests from the Government for quotations and deliveries and, based upon information received from petitioner, Sims made bids for various jobs, wrote up the specifications and transmitted them to petitioner, followed up on deliveries and the collection of invoices, and handled any complaints that might arise. Sims received from petitioner a 5-percent commission on sales and under an arrangement with Robert A. Blauner the two men split the commissions on a 50–50 basis. The commission checks from petitioner were made payable to Sims. A partnership, the J & R Supply Co., was formed by Sims and Robert A. Blauner as part of the commission-splitting arrangement and commissions received from petitioner were funneled through this entity. The partnership arrangement lasted from about July 1, 1950, to June 30, 1952, and during this period at least $175,000 was split between Sims and Robert A. Blauner.

Robert A. Blauner did not spend any appreciable amount of time in the Washington, D.C., office after Sims was hired, but for the most part kept informed by telephone. R. A. Blauner devoted his time to petitioner's New York City office during this period. About February

1951 Robert A. Blauner moved to Cuba where he took steps to establish his residence. After Robert A. Blauner departed for Cuba in February 1951 Sims continued to split with him the commissions received from petitioner on the sales made to the Government.

Sometime in 1950 a scheme was devised by R. J. Blauner under which 5 or 6 percent of the sales price of certain Government orders for business forms obtained by petitioner was added to the regular price for carbon paper which was purchased by petitioner from American Carbon in connection with these orders. Although the term "special grade" was used in pricing sheets relating to these purchases of carbon paper from American Carbon the product was not in fact a special grade. Under the scheme American Carbon then paid five-sixths of the premiums (i.e., the excess of the amount paid by petitioner for these particular purchases of carbon paper over American Carbon's usual selling price) to the Jersey Coast Sales Co. and retained one-sixth for its own expenses. The total premium payments made by petitioner to American Carbon under this arrangement over the period from about July 1950 to about October 1951 were in the respective amounts of $44,478.13 and $101,621.43. These amounts were included in petitioner's cost of purchases in its corporation income tax returns for 1950 and 1951.

Jersey Coast Sales Co. was a purported partnership between Robert A. Blauner and Karen Taylor.[2] Partnership information returns of income were filed by the partnership for each of the fiscal years ending June 30, 1951 and 1952, showing gross receipts in the respective amounts of $89,858.69 and $43,456.45. The information returns for fiscal year 1951 and 1952 show disbursements to Robert A. Blauner in the respective amounts of $82,273.23 and $41,456.45 and to Karen Taylor in the respective amounts of $7,585.46 and $2,000. In both information returns the address of R. A. Blauner is shown as Havana, Cuba. Both returns show a partnership address at 1228 National Newark Building, Newark, N.J. Robert A. Blauner individually employed a secretarial telephone and mailing service at that address from September 1950 to April 1954.

Beginning in April 1951 and continuing most of the year the payments from American Carbon to Jersey Coast Sales Co. were routed through W. J. Sims (as agent of Jersey Coast Sales Co.) who in turn forwarded payments to Robert A. Blauner by wire or by personal check.

In June 1951 a revenue agent began an audit of petitioner's corporation income tax return for 1949. Sometime after the audit for 1949

---

[2] Karen's maiden name was Katherman but she used the surname Taylor in business. At the time of the criminal trial in 1960 (which is hereinafter mentioned), she was Karen Katherman Stewart.

began this revenue agent notified petitioner that it would be necessary to audit the income tax return for 1950 because of a net operating loss carryover from 1949.

In June 1951 a discussion was held between petitioner and representatives of its firm of certified public accountants who had learned during the course of its 1950 audit of petitioner's books and records of the excess payments made by petitioner to American Carbon in 1950. It was the accounting firm's position that a statement had to be made in the audit report for 1950 calling attention to these excess payments. The matter was further discussed at meetings in November 1951 attended by officers of petitioner, representatives of the accounting firm, petitioner's attorney, and R. J. Blauner (who was present at two of the meetings) and on Dcember 7, 1951, the parties (including Robert J. Blauner) discussed a draft of a proposed letter from petitioner to the then collector of internal revenue at St. Louis. The purpose of the letter, which was mailed to the then collector of internal revenue under date of December 7, 1951, was to make a voluntary disclosure that petitioner's 1950 corporation income tax return was incorrect in that the excess payments in the amount of $44,478.13 to American Carbon had been included in petitioner's cost of purchases. The letter also disclosed that five-sixths of these excess payments had gone to Jersey Coast Sales Co. and ultimately to Robert A. Blauner and Karen Taylor.

The firm of accountants, which had conducted audits for petitioner and had prepared its tax returns since 1943, withdrew as petitioner's accountants on or about December 10, 1951. A newly employed firm of accountants audited petitioner's accounts for 1951 and prepared its corporation income tax return for that year. During the course of the audit the amount of excess payments made by petitioner for carbon paper to American Carbon in the amount of $101,621.43 was eliminated from the cost of sales account on petitioner's books and placed in the commissions account. Subsequently this term was put back into cost of sales by the new accountants and their audit report called attention to the fact that petitioner had made excess payments on certain orders from American Carbon and that a portion of these excess payments was remitted by American Carbon to Jersey Coast Sales Co. in which R. A. Blauner was a partner. A statement by the accountants attached to petitioner's 1951 return stated that "This return was prepared generally without independent determination of the deductibility of certain costs and expenses, and the accountants' exceptions set forth in the accountants' report are incorporated herein by reference as fully as if written herein and made a part hereof."

On September 1, 1944, Robert J. Blauner and Albert M. Bridell organized a partnership as equal partners under the name of Machin-

ery Development Co. The partnership was formed after three individuals with an engineering background who had been employed by a business forms company had offered their services for the engineering and development of bindery equipment for the production of business forms. The partnership employed the three individuals together with a fourth individual who had a similar background, purchased an existing machine shop on leased premises in Chicago, and commenced operations.

In its manufacture of business forms petitioner uses multiple presses, collators, staplers, and interleavers. It is the function of the collators, staplers, and interleavers to gather the rolls of printed forms into finished business forms. The function of an interleaver is to place a sheet of one-time carbon paper between a two-part form. In 1944 no manufacturers of interleavers were in existence; instead, such equipment had to be custom-built or devised and engineered by the printing establishment requiring such equipment. At this time the interleafing at petitioner's plant was a hand operation.

In addition to its development of other equipment Machinery Development Co. developed and built an interleaver made of bar steel and equipped with air motors and sensing devices. The machine weighed about a ton and its dimensions were about 7 or 8 feet high, about 10 feet long and 3 or 4 feet wide. Machinery Development Co. constructed a total of six interleavers which it leased to petitioner. Machinery Development Co. also developed and built seven staplers which it leased to petitioner. Petitioner paid a monthly rate of $70 for each stapler and a monthly rate of $200 for each interleaver leased from Machinery Development Co. By April 1949, petitioner had paid total rentals of approximately $100,000 to the partnership.

On April 30, 1949, petitioner purchased the six interleavers and seven staplers from Machinery Development Co. for $7,187.16, which amount represented the total net depreciated value of the machinery as of March 15, 1949. Subsequent to the purchases of the machinery petitioner commenced monthly payments of $1,053 to Machinery Development Co. and charged these payments to engineering expense. The monthly payments totaled $9,477 for 9 months in 1949 and $12,636 for each of the years 1950, 1951, and 1952. During the period 1949 through 1952 Machinery Development Co. performed engineering services in connection with petitioner's litho-liner program. The litho-liner was an aligning device which was attached to typewriters and performed the function of advancing continuous business forms. The litho-liner had to be adapted to each typewriter model.

Machinery Development Co. reported net income (or loss) for the taxable years ended August 31, 1949 through 1952, as follows:

TYE *Aug. 31—*

| | |
|---|---:|
| 1949 | ($5, 940. 53) |
| 1950 | 231. 19 |
| 1951 | 9, 894. 86 |
| 1952 | (6, 344. 23) |
| Taxable period ended 11/30/52 | 1, 921. 86 |

Rath Packing Co. had been one of petitioner's customers for at least 10 years prior to 1950. Early in 1950 Albert M. Bridell agreed to develop an automatic tag numbering machine for the Rath Packing Co. Subsequently the Machinery Development Co. succeeded in developing and manufacturing such a machine. Bridell had agreed with Rath Packing Co. to develop such a machine for $5,000 and Rath Packing Co. had issued a purchase order to Machinery Development Co. in that amount. In November 1951, subsequent to the delivery of the machine, Rath Packing Co. agreed to pay an additional $5,000 to Machinery Development Co. to defray additional development costs.

As of December 31, 1951, petitioner accrued a liability of $6,000 to the Machinery Development Co. to cover a portion of the development costs of the automatic tag numbering machine incurred by Machinery Development Co. in excess of the amount billed to Rath Packing Co. Petitioner subsequently in 1952 paid the amount of $6,000 to Machinery Development Co.

Respondent disallowed deductions claimed by petitioner for amounts paid to Machinery Development Co. during the years 1949 through 1952 as follows:

| | 1949 | 1950 | 1951 | 1952 |
|---|---:|---:|---:|---:|
| Machinery rental | $5, 070 | | | |
| Engineering services | 9, 477 | $12, 636 | [1] $18, 636 | $12, 636 |
| | 14, 547 | 12, 636 | 18, 636 | 12, 636 |

[1] Includes the amount of $6,000 paid by petitioner in 1952 to Machinery Development Co. in connection with the machine developed by the latter for Rath Packing Co.

Early in 1951 Robert J. Blauner and his wife went to Miami Beach, Fla., where they stayed on rented premises for several months. In April 1951 American Carbon Co., acting through Robert J. Blauner, purchased an ocean-front mansion (called Presque Rio) at 708 Royal Plaza, Ft. Lauderdale, Fla., for $90,000. Early in April 1951 American Carbon Co. purchased a 46-foot Cris-craft Cruiser for $21,500 and renamed the yacht *Tara*. In the latter part of April 1951 the yacht was moved to a permanent berth at 708 Royal Plaza, Ft. Lauderdale, Fla. Presque Rio and *Tara* were used during 1951 and 1952 by members of the Blauner and Bridell families and their personal friends. On occasion employees of petitioner as well as representatives and employees of customers of petitioner were entertained as house guests at Presque Rio and as guests aboard the *Tara*.

Petitioner reimbursed Robert J. Blauner for various expenditures incurred in Florida. Petitioner claimed a deduction on its 1951 corporation income tax return in the amount of $31,534.84 as travel expenses paid for Robert J. Blauner, which amount included the Florida expenses. Respondent allowed $2,392.52 of the claimed amount and disallowed the balance of $29,142.32. Petitioner deducted on its 1952 corporation income tax return the amount of $12,468.19 as travel expenses for Robert J. Blauner, which amount included Florida expenses. Respondent allowed $1,357.35 of the claimed amount and disallowed the balance of $11,110.84. The Florida expenses for each year included many items for food, liquor, clothing, maid service, and household goods and supplies.

Karen K. Taylor was employed by petitioner for a period of approximately 10 years beginning in 1936. When she left petitioner's employ about 1946 she worked in Texas for about a year, then went to work for Robert A. Blauner in New York City in connection with a manufacturers' agency. She was placed on petitioner's payroll from late in 1950 or early in 1951 until December 1952. In June 1951 she moved from New York City to Charlotte, N.C. In the spring or summer of 1951 she visited Robert A. Blauner in Cuba and subsequently visited him there on at least five more occasions. Petitioner made semimonthly payments of $500 to Karen Taylor for 7 months in 1951 and for the first 3 months in 1952 after which the regular semimonthly payments for the remainder of 1952 were reduced in amount. These payments were shown on petitioner's books as commissions. Petitioner claimed deductions as compensation for these payments made to Karen Taylor in 1951 and 1952 in the respective amounts of $7,000 and $8,125. Respondent disallowed these deductions in full.

On June 12, 1957, an indictment on three counts was returned in the U.S. District Court, Eastern District of Missouri, Eastern Division, against Robert J. Blauner, Robert A. Blauner, and Homer W. Stanhope. Count 1, which charged that the three individuals, who were officers of the petitioner corporation, did willfully and knowingly attempt to evade and defeat a part of the taxes owed by petitioner for 1950 by filing a false return within the meaning of section 145(b) of the 1939 Internal Revenue Code, was dismissed prior to trial on the ground that the time within which to bring the charge contained therein had expired prior to return of the indictment. Count 2 stated as follows:

That on or about July 16, 1952, at St. Louis, Missouri, in the Eastern Division of the Eastern District of Missouri,

ROBERT J. BLAUNER,
HOMER W. STANHOPE,
and
ROBERT A. BLAUNER,

who were the President, Secretary and Comptroller, and employee and agent, respectively of American Lithofold Corporation, a corporation, did willfully and

▆▆▆▆▆▆▆▆▆▆▆▆▆  ▆▆

knowingly attempt to evade and defeat a large part of the taxes due and owing by the corporation to the United States of America for the calendar year 1951, by filing and causing to be filed with the Collector of Internal Revenue for the First Internal Revenue Collection District of Missouri, at St. Louis, Missouri, a false and fraudulent tax return wherein they alleged that the net income of the corporation for the said calendar year was the sum of $357,650.37, and that the total amount of tax due thereon was the sum of $235,577.46, whereas, as they then and there well knew, the net income of the corporation for the said calendar year was the sum of $593,127.00, upon which net income the corporation owed to the United States of America a total tax of $406,698.17.

In violation of Section 145(b), Title 26, United States Code (1939).

Count 3 of the indictment charged the same three individuals with willfully conspiring to defraud the United States of income taxes due it by petitioner corporation for the year 1951.

On May 13, 1960, the U.S. District Court entered judgment of guilty against Robert J. Blauner. The judgment stated in part as follows:

IT IS ADJUDGED that the defendant has been convicted upon his plea of not guilty, entered on June 24, 1957, and a jury verdict of guilty, entered April 7, 1960, of the offenses of willfully and knowingly attempting to evade and defeat a large part of taxes due and owing to the U.S. of A., for the calendar year 1951, by filing and causing to be filed with the Collector of Int. Rev. at St. Louis, Mo., a false and fraudulent return, in viol. of Sec. 145(b) T. 26, U.S.C. (1939) as charged in Count 2 of Ind; willfully and unlawfully conspiring, combining, confederating and agreeing with others to defraud the U.S. of A. of income taxes due and owing to it by Amer. Lithofold Corp., for the calendar year 1951, while acting as an officer thereof, by various unlawful actions and specific overt acts in viol. Sec. 371, T. 18 U.S.C. as charged in Count 3 of indictment * * *

The judgment against Robert J. Blauner was affirmed in *Blauner* v. *United States*, 293 F. 2d 723 (C.A. 8, 1961), certiorari denied 368 U.S. 931 (1961). Homer W. Stanhope was acquitted of all charges under counts 2 and 3 of the indictment. It is stipulated that, to date, Robert A. Blauner has not been tried on the charges.

Under a stipulation of the parties the transcript of the trial in the U.S. District Court was made a part of the record in this case before us, together with plaintiff's and defendants' exhibits received in evidence during said trial. It has also been stipulated "if the witnesses of the United States in that proceeding were called to testify as respondent's witnesses in this proceeding, they would testify as they did in that proceeding" and that "all exhibits introduced and received during [the former trial] may be considered in evidence in this proceeding."

A part of the deficiency for each of the years 1950 and 1951 was due to fraud with intent to evade tax. Petitioner's corporation income tax returns for the years 1950 and 1951 were false and fraudulent with intent to evade tax.

### OPINION

The first issue is whether respondent correctly disallowed the amounts of $44,478.13 and $101,621.43 which were included by peti-

tioner in its cost of purchases of carbon paper from American Carbon in the years 1950 and 1951, respectively. Petitioner argues that these amounts represented commissions paid on Government orders for its business forms and are, therefore, deductible as ordinary and necessary business expenses under section 23(a)(1). Petitioner has the burden of proof on this issue.

Petitioner and American Carbon were closely interrelated throughout the period here involved. The Blauner and Bridell families controlled both corporations. Robert J. Blauner was vice president and general manager of petitioner in 1949 and 1950 and became president some time in 1951. During this period he was also treasurer of American Carbon and Albert M. Bridell (Robert J. Blauner's son-in-law) was president of the corporation. American Carbon owned more than 20 percent of petitioner's common stock as of December 31, 1950 and 1951, and during the years here involved between 80 percent and 90 percent of the sales of American Carbon were to petitioner.

Under the method devised by Robert J. Blauner in 1950 an amount equivalent to a commission of 6 percent (sometimes 5 percent) on certain Government orders for business forms was added by employees of petitioner on purchase orders to the cost of certain paper purchased from American Carbon and used in the production of such business forms. A false notation of "special grade" carbon paper was made on the relevant pricing sheets. When American Carbon received these overpayments for carbon paper it retained for itself one-sixth of the purported commissions and then passed on the remaining five-sixths to Jersey Coast Sales Co., a purported partnership consisting of Robert A. Blauner (Robert J. Blauner's son) and Karen Taylor, a friend and associate of Robert A. Blauner.

Petitioner contends that Robert J. Blauner felt it was necessary to pay these commissions to his son in order to obtain Government orders and that the circuitous method of channeling the payments to Robert A. Blauner was adopted merely to conceal a possible conflict with compensation restrictions in an outstanding RFC loan agreement. We give no credence to either of these contentions. It is strikingly clear from this record that Robert A. Blauner was not responsible for the Government orders obtained by petitioner in 1950 and 1951. From early February 1951 he was living in Havana, Cuba, where he obviously was remote from any business dealings with the U.S. Government. Assuming that his purpose in going to Havana was to open an office there for petitioner (although the record contains evidence that his move was prompted by Federal income tax problems), his activities there on petitioner's behalf hardly warranted the substantial payments channeled to him in the guise of commissions. The evidence shows that the only sales generated by the Cuban office in 1951 were

in the amount of $348.50. Moreover, petitioner's records reveal that Robert A. Blauner was not credited with any commercial sales in either 1950 or 1951, except for the token sales from the Cuban office.

From June 1950 through the year 1951, petitioner's Washington, D.C., office was managed by William J. Sims. He worked for petitioner as a salesman on a commission basis and handled nothing but Government sales.[3] Robert A. Blauner did not spend any appreciable amount of time in the Washington, D.C., office during 1950 or in the brief period in 1951 prior to his departure for Havana. Under an oral arrangement with Sims, all commissions on Government sales from about June or July 1950 through the year 1951 were split evenly between Sims and Robert A. Blauner. Against this background, it clearly appears that the purported commissions routed by petitioner to Robert A. Blauner via American Carbon and Jersey Coast Sales Co. could have nothing to do with Robert A. Blauner's ability or efforts to get Government contracts.

The spurious nature of Jersey Coast Sales Co. is revealed by the testimony of Karen Taylor (at the criminal trial in 1960) who was purportedly one of the partners. She could not recall anything about the partnership and could not recall whether she did any work for the partnership. She also testified that she never did any work for petitioner in connection with Government contracts in Washington, D.C., during 1950 and 1951.

Petitioner's explanation that the purported commissions in 1950 and 1951 were camouflaged solely to avoid conflict with the compensation restrictions in an outstanding RFC loan agreement cannot be taken seriously. The record shows that petitioner repaid the RFC in August 1950, shortly after the payments to Jersey Coast Sales Co. began, and yet the payments continued unabated through the remainder of 1950 and all of 1951.[4]

We hold, on the basis of the entire record, that the payments made by petitioner purportedly as commissions during 1950 and 1951 in the respective amounts of $44,478.13 and $101,621.43 did not constitute ordinary and necessary business expenses deductible under section 23 (a) (1).

The next issue is whether payments made by petitioner to Karen Taylor purportedly as compensation in 1951 and 1952 in the respective amounts of $7,000 and $8,125 are deductible as ordinary and necessary business expenses under section 23(a). Respondent disallowed in full the deductions claimed by petitioner for these payments. Section

---

[3] Sims testified that his sales work was primarily with the military branches.

[4] Robert J. Blauner offered the obscure explanation to a Justice Department attorney in 1955 that these payments were continued long after the RFC loan was repaid because he (Blauner) "didn't want people to think * * * there was anything wrong in the payments."

23(a) (1) allows as a business deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered." Before the question of the reasonableness of the compensation can be reached we must first deal with the threshold question whether petitioner actually received the benefit of any personal services from Karen. Petitioner has the burden of proof on this issue.

Karen was first employed by petitioner in 1936 and worked there for approximately 10 years. She testified that she was rehired by petitioner late in 1950 or early in 1951 [5] and stayed with petitioner until December 1952. After a brief time in New York City (where she was originally hired by Robert A. Blauner) she moved to Charlotte, N.C., in June 1951. The disputed payments to her cover the 7-month period from June through December 1951, and the entire year 1952.

Petitioner has again failed to meet its burden of showing that the payments to Karen were in fact compensation for services actually rendered to petitioner. It appears that she left New York a few months after Robert A. Blauner left the petitioner's New York City office and moved to Cuba. In the spring or summer of 1951 she visited Robert A. Blauner in Cuba and ultimately made about a half dozen trips to Cuba to visit him. There is no indication that petitioner's business was the reason for these trips. She testified vaguely that she went to Charlotte, N.C., with a title of Southeast District Manager or Division Manager and that she had supervision over newly opened sales offices of petitioner in the southeastern part of the United States. It seems odd that this purported expansion into a new area took place when, presumably as a result of the Korean War, petitioner's sales had increased substantially. Its Government sales climbed to $3,121,194.27 in 1951 from $1,401,696.92 in 1950 and its total net sales rose to approximately $6,359,000 in 1951 from $3,743,650 in 1950. At any rate, we are not told just where these offices were, or whether they produced any appreciable volume of sales, or the personnel working in such offices. What sales, if any, were generated by Karen's efforts are not disclosed. Petitioner's payroll records, which interestingly enough describe Karen as an independent agent, show regular semimonthly payments of $500 to her over the period from June 1951 through March 1952, at which time the regular semimonthly payments were reduced in amount until, in the last few months of 1952, the semimonthly payments were in the amount of $250. The petitioner's records identify these payments as commissions. Although Karen described her work as saleswork it is difficult to believe that these regular semimonthly

---

[5] Karen was not sure as to who paid her when she returned to work late in 1950 or early in 1951 although she believed that the payments came from Robert A. Blauner for a few months.

payments in unvarying amounts over substantial periods of time were in fact commissions for saleswork actually performed.

In short, in view of the contradictions that appear in the record as to the exact nature of Karen's duties and the paucity of any persuasive evidence that would throw some light on what services, if any, she actually performed for petitioner, we cannot find on this record that petitioner has met its burden of showing that any portion of the $7,000 and $8,125 paid to Karen in 1951 and 1952, respectively, constituted a salary or other compensation for personal services actually rendered to petitioner within the meaning of section 23(a) (1).

The next issue is whether petitioner is entitled to deduct as ordinary and necessary business expenses under section 23(a) (1) the amounts of $14,547, $12,636, $18,636, and $12,636 paid to Machinery Development Co. in the years 1949, 1950, 1951, and 1952, respectively. The amount disallowed in 1949 represents total rentals for six interleavers and seven staplers in the amount of $5,070 for the first 3 months of the year and engineering expenses in the amount of $9,477 (monthly payments of $1,053) paid by the petitioner to Machinery Development Co. for the remainder of the year. The amount of $12,636 disallowed in each of the years 1950, 1951, and 1952 represents the monthly payments continued by petitioner over these years. The additional $6,000 disallowed in 1951 represents a payment to Machinery Development Co. to cover certain excessive costs incurred by Machinery Development Co. in the development of a tag numbering machine for the Rath Packing Co.

Machinery Development Co. was a partnership formed in 1944 with Robert J. Blauner and Albert M. Bridell as equal partners. The partnership purchased a machine shop on leased premises and engaged four engineers who immediately undertook the task of developing certain specialized machinery required by petitioner in its printing operations. Bridell testified that the partnership successfully developed machinery to perform operations which theretofore had been performed manually in petitioner's plant. The machinery developed by the partnership could not be purchased or leased from other manufacturers. Several types of machinery were developed, including an interleaver and an automatic stapler, both of which Bridell described in detail. The partnership constructed six interleavers which it leased to petitioner at a monthly rental of $200 for each machine and also constructed seven automatic staplers which it also leased to petitioner at a monthly rental of $70 for each machine. Petitioner purchased all of the interleavers and staplers from the partnership on April 30, 1949, for $7,187.16, the net depreciated value of the machinery as of March 15, 1949, and subsequent to the purchase commenced monthly payments

of $1,053 to the partnership for the rest of the year 1949 and throughout each of the years 1950, 1951, and 1952 which it charged on its books as engineering expense.

We believe the evidence establishes that the amounts paid by petitioner to the partnership through the first 3 months of 1949 were in fact rentals for the use of the above-described machinery. Respondent compares the total rents received by Machinery Development Co. over a 5-year period with the original total cost of the machinery ($25,409.61) and concludes that "it is quickly apparent that the amount paid as rent in 1949 was unreasonable." We are unimpressed with respondent's argument. Respondent cites no authority for his inflexible proposition that rentals of property are automatically unreasonable and therefore unallowable as business deductions simply because the total rentals at some point over the years exceed the original cost of the property rented. Perhaps in situations of a close relationship between lessor and lessee, as in the case of a corporation leasing property from the sole stockholder, this particular factor could be considered along with other factors in determining whether the rentals paid are in fact rentals rather than disguised distributions of earnings and profits. See *Limericks, Inc.*, 7 T.C. 1129 (1946), affd. 165 F. 2d 483 (C.A. 5, 1948). Respondent makes no effort to show that the rentals were disguised dividends from petitioner to Bridell and Robert J. Blauner, and what evidence we do have suggests otherwise: Machinery Development Co. reported a net loss of about $6,000 for its taxable year ending August 31, 1949, net income of $231.19 and $9,894.86 for its taxable years ending August 31, 1950 and 1951, and a net loss of about $6,300 for its taxable year ending August 31, 1952.

It also appears that the interleavers and staplers were developed by the skilled engineers employed by Machinery Development Co. and that the machinery developed was not available from outside manufacturers. Under these circumstances the bare cost of developing such machinery would be a misleading and unreliable yardstick for fair rental value. Finally, it should be pointed out that Machinery Development Co., in determining the $25,409.61 original cost in developing the machinery in question, considered only the materials and direct labor that went into the manufacture of the machinery, omitting other items that normally enter into a computation of cost.

Respondent also argues, without much apparent conviction, that the machinery rentals are not deductible as business expenses under section 23(a)(1) because such payments were made by petitioner for the purpose of acquiring an equity interest in the machines. Apart from citing *Oesterreich* v. *Commissioner*, 226 F. 2d 798 (C.A. 9, 1955), respondent does not pursue his argument and we are satisfied that

it is without merit. In determining whether an agreement is a lease or a contract for the sale of property the intent of the parties and the legal effect of any pertinent instruments must be considered. *Oesterreich* v. *Commisisoner, supra.* There is nothing in the record to suggest that the petitioner had any fixed right to purchase the machinery after a period of time or that the parties evinced any intent that title to the machinery would eventually be transferred to petitioner. Nor do we have any evidence that petitioner, after an interval of rentals, had an option to purchase the machinery at a price which would be economically unreal when measured against the value of the property. We are convinced that the payments in the first 3 months of 1949 were in fact rentals required to be paid by petitioner for the use of the interleavers and staplers and are therefore deductible as ordinary and necessary business expenses under section 23 (a) (1).

We are persuaded on the basis of the entire record that the monthly payments of $1,053 by petitioner to Machinery Development Co. beginning in April 1949 and continuing through 1951, were also ordinary and necessary business expenses deductible under section 23 (a) (1). Bridell testified that throughout this entire period an employee of Machinery Development Co. worked on a patented device called the litho-liner which was attached to typewriters to align and advance continuous business forms fed into the typewriter. It was continually necessary to adapt these devices to different typewriter models. Petitioner owned the device and Machinery Development Co. provided the engineering and development services that were necessary to keep the device currently effective. Machinery Development Co. machined the needed parts for the device and kept inventories. Bridell testified that the one employee of Machinery Development Co. who worked almost exclusively on petitioners litho-liner was paid $600 a month during the years 1949 through 1952. It also appears that Machinery Development Co. had servicemen who installed the devices for petitioner's customers and then serviced such devices to keep them operating properly, charging petitioner directly for the amount of time and other expenses involved.

It is perhaps unusual to make a fixed monthly payment to cover such services which Machinery Development Co. performed in its role as petitioner's engineering arm. However, when we consider the monthly salary of the employee mentioned above and also consider the fact that Machinery Development Co. furnished the space (on leased premises) and the materials necessary for the engineering and development services it provided for petitioner, we are disposed to accept petitioner's contention that the monthly payment of $1,053 was a reasonable approximation of the cost to Machinery Development Co. in providing such services.

Petitioner deducted in 1951 the amount of $6,000 representing an accrued liability to Machinery Development Co. which was subsequently paid. Petitioner now claims in an amendment to its petition that because the payment of $6,000 was approved by its board of directors at a special meeting held on February 14, 1952, the expenditure is deductible in 1952 instead of 1951. We agree with respondent that petitioner is not entitled to deduct this amount as a business expense in 1952 or in any other year.

Machinery Development Co. early in 1950 undertook the development of an automatic tag numbering machine for Rath Packing Co., one of petitioner's customers of long standing. Rath Packing Co. agreed to pay $5,000 for the machine. Machinery Development Co. succeeded in developing the machine over a period of about a year and a half but in doing so incurred costs for materials and labor in excess of $18,000. Late in 1951 Bridell discussed these unanticipated costs with officials of Rath Packing Co. and as a result of these discussions the company agreed to pay an additional $5,000 to Machinery Development Co. At a special meeting of petitioner's board of directors held on February 14, 1952, a motion was adopted to "approve payment to Machinery Development Co. in the sum of $6,000.00, and the liability to be recorded on the books as at 12/31/51, to cover a portion of the experimental and other costs of a numbering machine manufactured by Machinery Development Company for the Rath Packing Company, during the year 1951, and in excess of the amount billed to Rath."

It is well established that where a taxpayer undertakes to pay another's expenses or obligations, such payments are not deductible as ordinary and necessary expenses incurred in the taxpayer's trade or business. *Interstate Transit Lines* v. *Commissioner*, 319 U.S. 590 (1943); *Deputy* v. *DuPont*, 308 U.S. 488 (1940). We fail to see how this payment by petitioner of the expenditures incurred by Machinery Development Co., an entity separate and distinct from petitioner, can be construed as an expenditure incurred in *petitioner's* business. It is immaterial that Rath Packing Co. had been a customer of petitioner for years and continued as a customer after the machine was placed in operation. There is no evidence to show that it was in anyway necessary for petitioner to incur this expense in order to keep Rath Packing Co. as a customer. It was not the business of petitioner to develop machinery for its customers.

It should be stressed that the inquiry here is not whether the payment by petitioner was voluntary or whether it was made under a contractual obligation. See *Interstate Transit Lines* v. *Commissioner*, *supra*. Instead, the question is purely a factual one, i.e., whether the

payment of $6,000 was an ordinary and necessary expense incurred by petitioner to benefit and promote its own trade or business. We find that it was not.

The next issue is whether respondent correctly disallowed a portion of the travel and entertainment expenses incurred by Robert J. Blauner and deducted by petitioner as business expenses under section 23(a)(1). Petitioner deducted $31,534.84 and $12,468.19 in 1951 and 1952, respectively, for travel and entertainment expenses incurred by Robert J. Blauner. Respondent disallowed $29,142.32 and $11,110.84 of the amounts claimed as deductions in 1951 and 1952, respectively. A substantial portion of the amounts disallowed represent expenditures incurred by Robert J. Blauner in Florida during these 2 years.

Early in 1951 Robert J. Blauner and his wife went to Florida where they stayed either at a hotel or in a rented house for several months. In April 1951 American Carbon purchased an ocean-front mansion (Presque Rio) in Ft. Lauderdale for $90,000 and a 46-foot boat (*Tara*) for $21,500. American Carbon paid some of the expenditures incurred in maintaining the house and boat,[6] and petitioner paid substantially all of the remaining expenses. Petitioner maintains that Florida expenses were a joint effort by petitioner and American Carbon to conduct a "business entertainment program" in Florida.

To prevail here petitioner has the burden of showing that the substantial Florida expenses incurred by Robert J. Blauner, purportedly for business entertainment, in 1951 and 1952 were proximately related to its trade or business; it is not enough that there may be some remote or incidental connection. *Ralph E. Larrabee*, 33 T.C. 838 (1960). Petitioner must show that these expenses were prompted by business rather than by social reasons. *Eugene H. Walet, Jr.*, 31 T.C. 461 (1958), affirmed per curiam 272 F. 2d 694 (C.A. 5, 1959).

Robert J. Blauner and his wife and Albert M. Bridell and his wife stayed at Presque Rio at various intervals. Among the guests entertained at Presque Rio were members and relatives of either the Blauner or the Bridell families. Entertainment activities included jai alai games, trips to Key West and deep sea fishing. We have carefully examined Bridell's testimony, the log and guest books, and the stipulations listing the various guests entertained both in connection with Presque Rio and *Tara*. The stipulated list of guests includes some individuals who were associated in one capacity or another with various customers of the petitioner. We do not find the evidence very helpful. The mere recital of the names of these "business" guests does not establish that their presence at Presque Rio was proximately related to petitioner's business. As we stated in *Challenge Manufacturing*

---

[6] Petitioner on brief states that American Carbon paid the wages of the housekeeper at Presque Rio as well as the wages of the boat's captain.

*Co.*, 37 T.C. 650, 659 (1962), "It is entirely normal for friendships to develop with some of those that one meets in business transactions." There is no evidence that business discussions ever took place during the stay of these "business" guests at Presque Rio or aboard the *Tara* and we are left with the impression that none were ever intended. There was some testimony by Bridell that salesmen of either American Carbon or petitioner were encouraged to offer the Florida facilities to customers. But the evidence is too general and meager to show that such sales program took effect during the years before us and to warrant a finding that at least some portion of the expenditures were business-oriented. Nor does the occasional visit of an employee of petitioner establish a business use of the property.

We are persuaded upon examination of the entire record, including the expense vouchers which show the types of expenditures involved, that the Florida expenses were knowingly incurred for personal pleasure and enjoyment of the individual members of the Blauner and Bridell families, their friends and relations, and then charged to petitioner corporation. There is insufficient evidence to show that any of the Florida expenditures in 1951 and 1952 were proximately related to petitioner's business. We hold that petitioner is not entitled to deduct any of these expenses in 1951 and 1952 as ordinary and necessary business expenses.

Similarly, there is insufficient evidence in the record to show that the remaining portion of the disallowed expenses incurred by Robert J. Blauner (but not in connection with the Florida entertainment) was proximately related to petitioner's business. The evidence on these other expenditures is likewise meager. Petitioner on brief merely mentions expenses incurred for flowers and also reimbursements to Robert J. Blauner for his residential telephone bill but does not produce evidence to show how these expenditures were related to its business. We cannot find, on this record, that these remaining expenditures incurred in 1951 and 1952 were ordinary and necessary business expenses.

Respondent determined that a part of the deficiency for each of the years 1950 and 1951 was due to fraud with intent to evade tax within the meaning of section 293(b). He contends that since Robert J. Blauner, a principal stockholder, officer, and virtual alter ego of petitioner, was convicted of attempted evasion of the corporate income taxes for the year 1951 and for conspiring to defraud the United States of income taxes due and owing to it by American Lithofold Corp. for 1951, petitioner is collaterally estopped from proving that some part of the 1951 deficiency was not due to fraud. We cannot agree with this contention. In *C.B.C. Super Markets, Inc.*,

54 T.C. 882 (1970), we held that a corporation is not collaterally estopped by the conviction of its president and principal stockholder for filing or causing the corporation to file false and fraudulent corporate returns; the corporation itself is entitled to be heard on the question whether any part of its underpayments was due to fraud. That case is controlling here on the collateral estoppel issue for the year 1951 and we follow it.

The burden rests upon the respondent to prove fraud by clear and convincing evidence as to both years before us. *Arlette Coat Co.*, 14 T.C. 751 (1950). The existence of fraud with intent to evade tax must be affirmatively established. *Drieborg* v. *Commissioner*, 225 F. 2d 216 (C.A. 6, 1955). In *Spies* v. *United States*, 317 U.S. 492 (1943), the Supreme Court indicated that an affirmative willful attempt to evade tax "may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in the transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal." There is, however, ample evidence before us that clearly and convincingly establishes petitioner's fraud for 1950 and 1951.

The extensive record in the criminal case, *United States* v. *Robert J. Blauner, et al.*, which resulted in Blauner's conviction of willfully attempting to evade and defeat a large part of petitioner's income taxes for 1951 by filing and causing to be filed a false and fraudulent return, has been stipulated into the record of this case. Robert J. Blauner was convicted in that case on two counts, and the conviction was affirmed on appeal. *Blauner* v. *United States*, 293 F. 2d 723 (C.A. 8, 1961). We need not repeat herein all of the evidence and testimony in that record recited and reviewed by the Court of Appeals in its opinion as sufficient to sustain Robert J. Blauner's conviction in that case. Much of that same evidence is, however, clear and convincing evidence of petitioner's fraud here.

In the years 1950 and 1951, the cost of petitioner's purchases of carbon paper from American Carbon was overstated in the amount of $44,478.13 and $101,621.43, respectively. As indicated above, these overstatements were accomplished at the instigation of Robert J. Blauner through falsified purchase invoices which added the equivalent of a 6-percent commission to certain purchase orders of carbon paper. These excess payments were funneled through American Carbon which, after keeping one-sixth of these overpayments for its own trouble, passed on the remaining five-sixths to Jersey Coast Sales Co., a spurious partnership purportedly consisting of Robert A. Blauner

and Karen Taylor. These transactions were carefully disguised on petitioner's books and were fully intended to mislead anyone examining the books and records. Petitioner's explanation of this surreptitious method adopted to channel funds to Robert A. Blauner, i.e., that such funds were really commissions and that they were disguised only to fool the RFC, is entitled to no credence whatsoever and borders on the specious. We have discussed this so-called explanation earlier in the opinion and need not repeat such discussion here.

Robert J. Blauner was the dominant stockholder in the affairs of petitioner and he obviously exerted considerable influence in the affairs of American Carbon. Robert A. Blauner and Albert M. Bridell were also stockholders in petitioner corporation and American Carbon Paper Corp., controlled and dominated by Bridell and Robert J. Blauner, was also a substantial stockholder. The Blauner and Bridell families controlled both corporations. Robert J. Blauner was an executive officer of both corporations, becoming president of petitioner in 1951, and his son-in-law, Albert M. Bridell, was president of American Carbon through the entire period here involved. R. J. Blauner, A. M. Bridell, and R. A. Blauner were all involved with the actions which resulted in false and spurious charges on petitioner's books, reflected in its income tax returns for 1950 and 1951.

A corporation can only act through its officers and agents and their intentions may be imputed to the corporation. *Irving S. Federbush,* 34 T.C. 740 (1960), affirmed on other issues per curiam 325 F. 2d 1 (C.A. 2, 1963) ; *Auerbach Shoe Co.,* 21 T.C. 191 (1953), affd. 216 F. 2d 693 (C.A. 1, 1954). We conclude that here R. J. Blauner's intentions must be imputed to petitioner.

The record before us is clear that Robert J. Blauner dominated petitioner's affairs both as an officer and through his stockholdings and those of his family. He was the real and titular head of petitioner and what he said controlled petitioner's operations. There is evidence in the record that Albert M. Bridell, early in the fall of 1950, was fully aware of the scheme to funnel payments from petitioner to Jersey Coast Sales Co. via American Carbon and that Jersey Coast Sales Co. really stood for Robert A. Blauner. He also was well aware of how petitioner's books and records were doctored to reflect those spurious commissions as cost of goods purchased from American Carbon. The evidence also shows that William A. Leschen (Robert A. Blauner's father-in-law), who was petitioner's president for some time in 1950, as well as a stockholder, was aware of the plan as early as July or August of 1950. When petitioner's income tax returns for 1950 and 1951 were filed all of these dominant stockholder-officers were well aware that those returns were false and fraudulent as a result of the various schemes and devices employed. Their intention must be imputed to petitioner

under the facts disclosed by this record. *In Re Frank Fehr Brewing Co.*, 160. F. Supp. 631 (W.D. Ky. 1958), affirmed sub nom. *Clarke* v. *United States*, 274 F. 2d 824 (C.A. 6, 1960).

We do not have a situation here, such as that in *Botwinik Brothers of Mass., Inc.*, 39 T.C. 988 (1963), where an employee of a corporation owning only 40 out of a total of 750 shares of the corporation's stock misappropriated corporate funds over a period of years and falsified the corporate returns to conceal her fraud. We held in *Botwinik Brothers of Mass., Inc., supra*, that under those circumstances her fraud could not be imputed to the corporation on the theory that she was acting for it. We stated in that case that "The fact that she was a minority stockholder, whose interests were adverse to those of the corporation and the majority stockholders, is of crucial significance here." We also pointed out there that where sole or dominant stockholder-officers divert corporate funds for their own benefit, such action is not regarded as antagonistic to the corporation since such stockholders are to a large extent taking their own money and thus obtaining from the corporation what would otherwise be available to them as dividends.

Nor is the case of *Harry Sherin*, 13 T.C. 221 (1949), relied upon by petitioner, applicable here. In that case the 50-percent stockholder of a corporation exacted "commissions" from certain corporate customers over the OPA ceiling price and pocketed 90 percent of such "commissions," with 10 percent going to a participating sales agent. We held that such "commissions" never became the income of the corporate taxpayer and consequently the corporation was not liable for fraud for failing to report such amounts. The *Sherin* case is readily distinguishable from the factual situation here.

We have also considered *Asphalt Industries, Inc.* v. *Commissioner*, 384 F. 2d 229 (C.A. 3, 1967), reversing 46 T.C. 622 (1966), and we believe that it too is distinguishable. Once again, the factual pattern involved the embezzlement of corporate funds by a 50-percent stockholder-officer without the knowledge of the other 50-percent stockholder who was not dominated by the taxpayer. The embezzled funds were receipts from corporate sales which were not recorded on the corporate books and were omitted from the corporation income tax returns. Under these special circumstances, and the particular facts of that case, the Court of Appeals for the Third Circuit refused to impute the fraud of the wrongdoer to the corporation. The instant case presents a far different situation. See *In Re Frank Fehr Brewing Co., supra*.

In a letter to the then collector of internal revenue in St. Louis, dated December 7, 1951, the petitioner made a voluntary disclosure that its 1950 corporation income tax return was incorrect in that the excess payments of $44,478.13 to American Carbon had been included

in petitioner's cost of purchases. It also appears from the record that in June 1951 a revenue agent had begun an audit of petitioner's 1949 tax return and that sometime afterwards he had notified petitioner it would be necessary to go into 1950. Such voluntary disclosure does not prevent a finding of fraud for 1950. In *Estate of Harry Stoll Leyman*, 40 T.C. 100, 122 (1963), we stated that "A voluntary disclosure, even if made prior to the commencement of an investigation of a return by an internal revenue agent, does not justify the elimination of the addition to tax for the filing of a false or fraudulent return." It is also significant that after this disclosure as to its incorrect 1950 return the petitioner proceeded to file its 1951 return which again included the excess payments, this time in the amount of $101,621.43, in its cost of purchases.

There is no merit in petitioner's contention that it relied upon its accountants in treating the excess payments to American Carbon as part of its cost of purchases and that such reliance absolves petitioner from any determination of fraud. See *Haywood Lumber & Mining Co. v. Commissioner*, 178 F. 2d 769 (C.A. 2, 1950). The evidence shows that a representative of the accountants who audited the petitioner's records for 1950 and prepared its 1950 tax return contacted Robert J. Blauner and Albert M. Bridell in June of 1950 to inquire about the excess payments to American Carbon which had been found in cost of purchases. Blauner and Bridell explained that these payments represented commissions. The report for 1950 issued by the accountants under date of June 12, 1951, calls attention to these excess payments and merely repeats the explanation that they represented additional commissions deemed necessary to obtain orders. This accounting firm severed its connection with petitioner in December 1951.

A different firm of accountants conducted the 1951 audit and prepared petitioner's 1951 tax return. They too were confronted with the problem of the excess payments to American Carbon and after some hesitation left these amounts in cost of sales on petitioner's books and in the 1951 tax return. The firm's audit report for 1951 calls attention to these excess payments to American Carbon of approximately $102,000 and also notes that "[w]e were informed that approximately $85,000 of the above amount was remitted by American Carbon Paper Corporation to Jersey Coast Sales Company, in which Company R. A. Blauner is a partner."

It is quite apparent in the record that both accounting firms disclaimed any opinion as to the correctness of the deduction of these excess payments to American Carbon in 1950 and 1951. There is nothing to support petitioner's rather lame and tardy contention that it relied upon its accountants in handling these items as deductions and that such reliance shields it from any intimation of fraud.

928

We conclude and hold that respondent has shown by clear and convincing evidence that a part of the deficiency for each of the years 1950 and 1951 was due to fraud with intent to evade tax within the meaning of section 293(b). Our conclusion that the petitioner's corporation income tax returns with respect to the years 1950 and 1951 were false and fraudulent disposes of the statute of limitations issue with respect to the years 1950 and 1951. Sec. 276(a).

*Decision will be entered under Rule 50.*