Fumigators, Inc. v. Commissioner.
Fumigators, Inc. v. Commissioner
Docket No. 6284-69.
United States Tax Court
T.C. Memo 1972-13; 1972 Tax Ct. Memo LEXIS 242; 31 T.C.M. (CCH) 29; T.C.M. (RIA) 72013; January 17, 1972, Filed *242 1. Petitioner and Guaranty were owned by the same interests. During petitioner's busy season Guaranty performed work on a subcontract basis for petitioner, but Guaranty did not submit any invoices indicating the amount of subcontract work performed. The amount of 30 subcontract work could not be determined from the business records of petitioner or Guaranty. Held: Respondent was not arbitrary or unreasonable in using section 482 to deny petitioner deductions for subcontract work in excess of amounts actually paid by cash or check to Guaranty. 2. Petitioner paid Abbott, an unrelated corporation, $6,666.66 in each year in issue pursuant to a contract under which Abbott was to provide certain consulting services. Abbott performed few services for petitioner, and petitioner received little benefit for its payments. Held: Petitioner had a reasonable expectation of receiving benefits from Abbott, and the payments were ordinary and necessary expenses of its business deductible under section 162. Thomas L. Norris, Jr. and N. A. Townsend, Jr., 615 Oberlin Rd., Raleigh, N.C., for the petitioner. J. Randall Groves, for the respondent. TRWIN Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined the following deficiencies in petitioner's corporate income taxes: Year Ending
Deficiency
May 31, 1965
$4,974.85
May 31, 1966
6,074.36 The deficiencies stem from respondent's disallowance in part under section 482 of claimed subcontract expenses that petitioner owed a related corporation and from respondent's determination that petitioner's payment of $6,666.66 in each year to Abbott Corporation did not represent an ordinary and necessary expense to petitioner's business deductible under section 162. Findings of Fact Some of the facts have been stipulated *244 and they are so found. Petitioner is Fumigators, Inc. (hereafter Fumigators), a North Carolina corporation with its principal place of business in Raleigh, North Carolina. Fumigators was incorporated on March 7, 1955. Fumigators conducted its business operations on a fiscal year ending May 31, and utilized an accrual method of accounting. The corporate records of Fumigators disclose that, during the taxable years herein involved, W. C. McClellan, L. A. Hamm, and T. C. Smith together owned all of its outstanding common stock. The principal business conducted by Fumigators during the taxable years in issue was the fumigation of tobacco warehouses. Guaranty Exterminating Company (hereafter Guaranty) is a North Carolina Corporation with its principal place of business in Raleigh, North Carolina. The corporate records of Guaranty disclose that the common stock of Guaranty during the taxable years in issue was owned by W. C. McClellan, L. A. Hamm, and T. C. Smith. The principal business conducted by Guaranty is household extermination and pest control. Fumigators and Guaranty operate from the same building in Raleigh. The same individual performs bookkeeping and clerical services *245 for both Fumigators and Guaranty. The same individual provides telephone answering service to each corporation. Most business operations conducted by Fumigators take place during the period from April to October. This business activity consists of fumigating tobacco warehouses. The purpose of the fumigating is to kill the various bugs and insects that could otherwise ruin the tobacco that is stored. A cyanide gas is used. Therefore, after the necessary gas lines and nozzles are placed in the warehouse, it is necessary to seal the entire building. This is accomplished by taping doors, windows, vents, etc., with masking tape and paper. The cyanide gas is then pumped into the warehouse. During the time the gas is in the warehouse, it is necessary to post guards around the building in order to prevent anyone from entering the building or breaking the seal. During the busy season of Fumigators, certain employees of Guaranty perform services on contracts obtained by Fumigators. Fumigators included in its reported costs of sales, the amounts of $61,950 and $71,375 for the fiscal years ended May 31, 1965, and May 31, 1966, respectively, for claimed subcontract work performed by Guaranty. *246 31 Fumigators paid by check or cash to Guaranty only the sums of $58,350 and $59,370 for the fiscal years ended May 31, 1965, and May 31, 1966, respectively, for services performed on subcontracts. The difference in the amount actually paid in cash or by check and the amount claimed by Fumigators was reflected as a journal entry reducing amounts that Guaranty owed petitioner on open account for each of the fiscal years ended May 31, 1965, and May 31, 1966. Guaranty did not submit invoices representing these journal entries to Fumigators. In 1955 the stock of petitioner was held by David R. Orr, Walter E. Baker, and W.C. McClellan. McClellan and Hamm also acquired stock in Associated Business Corporation (hereafter referred to as "ABC") in 1955. In 1960 a stock exchange was effected wherein the stock of Fumigators which was issued in the name of Baker was transferred to McClellan, Hamm, Orr, and T.C. Smith in exchange for the ABC stock owned by McClellan and Hamm. The individuals acquiring the stock of Fumigators paid $650 to $800 in addition to the ABC stock in full payment for the Fumigators stock. As an incident of the stock exchange the new owners agreed to personally *247 guarantee obligations owed by petitioner to Abbott Corporation (hereafter Abbott). In January or February 1960, petitioner entered into a contract with Abbott Corporation for Abbott to provide management and consulting services to petitioner. At that time petitioner was being run by McClellan who had technical expertise in exterminating and fumigating but no managerial expertise. The 1960 contract with Abbott had a term of three years during which time petitioner was to pay Abbott $20,000. The contract could be extended on a year-to-year basis at petitioner's option. Under the contract petitioner was to receive general management, technical, legal, accounting, and financial advice upon request. In particular, Abbott was to provide at petitioner's request aid in preparing bids, finding supplies of cyanide gas, securing insurance and performance bonds, and procuring credit. During the first three years of the contract, petitioner received substantial benefits from Abbott; however, by 1965 petitioner was nearly self-sufficient and did not require much assistance from Abbott. Petitioner's own personnel was able to keep its books and records; petitioner was able to obtain insurance *248 necessary to its business from a local agent; petitioner had an assured supply of cyanide gas at a good price from its principal customer; petitioner had to prepare few (if any) bids to obtain work; and petitioner had to provide few (if any) performance bonds. During the years in issue both Abbott and its principal shareholder J. L. Pressman were suffering financial difficulties; therefore, it was unlikely that Abbott could have helped petitioner financially. In light of all of these factors, petitioner received few benefits under the contract with Abbott. Petitioner paid Abbott $6,66.66 in each of the years in issue. For this amount the only benefits that petitioner received were the presence of Pressman or another employee of Abbott for consultation at a few conferences and the ability of Abbott to procure insurance for petitioner in the event that the insurance obtained from the local agent was cancelled. This last benefit was a real one because the cyanide gas that petitioner used in its fumigating business made it a poor insurance risk whose coverage could be cancelled on short notice. Abbott was not related to petitioner either through common ownership of stock or through *249 familial ties among the shareholders of both corporations. The payments of $6,66.66 in each year to Abbott did not benefit the shareholders of petitioner personally. Abbott reported the payments received from petitioner as taxable income from providing services. Opinion Petitioner was in the fumigating business. During its busy season, petitioner had part of its work performed on a subcontract basis using employees from Guaranty, a corporation with which it shared a common ownership. The books of petitioner indicate that Guaranty charged petitioner $61,950 and $71,375 for the fiscal years ended May 31, 1965, and May 31, 1966, respectively, for work performed on subcontracts; however, petitioner only paid to Guaranty by cash or check $58,350 and $59,370 of these amounts. The differences between the amounts actually paid to Guaranty and the amounts charged were reflected in journal entries on petitioner's books reducing amounts owed to petitioner on open account by Guaranty. Respondent 32 disallowed under section 482 the portion of the subcontract expense that was not actually paid. Petitioner paid $6,666.66 to Abbott in 1965 and 1966 for consulting services pursuant to a *250 contract entered into in 1960. In the first years of the contract with Abbott petitioner obtained valuable benefits from the association with Abbott; however, during the years in issue the benefits that petitioner received were fairly insubstantial. Respondent disallowed deduction of the $6,666.66 in both years asscrting that the expenses were not ordinary and necessary under section 162. Subcontracting Expense Section 482 grants respondent broad discretion to allocate income and deductions among related business entities in order to clearly reflect income. Respondent's regulations and many cases have struggled to define the standard to be employed in making allocations. See section 1.482-2, Income Tax Regs.
In this case, however, we need not consider whether respondent employed a proper standard in disallowing part of the deductions attributable to work performed by Guaranty. The record here provides us with no basis for determining that respondent's allocation is incorrect under any standard; we are, in fact, afforded no information upon which it would be possible to determine what a fair price would be for the services that Guaranty supplied petitioner. We do not even know *251 what precisely those services were. At trial the bookkeeper for both petitioner and Guaranty testified that Guaranty charged petitioner for subcontract work under a formula which was designed to recoup for Guaranty only its salary and overhead expenses. The bookkeeper also attempted to verify that petitioner's subcontract expense for work performed by Guaranty was computed from records of both corporations using the formula that she described. Unfortunately, petitioner did not provide the Court with any invoices submitted by Guaranty or any corporate records of petitioner or Guaranty indicating the amount of work performed or the number of man-hours involved in the subcontracts. From the record we cannot say that such invoices or records ever existed. In the absence of any evidence that respondent's disallowance was incorrect we hold that petitioner may not deduct as subcontract expenses the amounts of $3,600 and $12,005 in the taxable years ended May 31, 1965 and May 31, 1966, respectively. Consulting Expense Section 162 limits deduction of expenses incurred in a trade or business to those that are ordinary and necessary. Generally, the term ordinary and necessary relates *252 to expenses which are usual for the type of business conducted and helpful to its success. Welch v. Helvering, 290 U.S. 111 (1933). Respondent contends that because Abbott performed few services for petitioner during the taxable years, the $6,666.66 payments to Abbott should not be deductible. We disagree. We note at the outset that Abbott was not in any way related to petitioner and that the payments did not benefit the shareholders of petitioner personally. These two facts distinguish the present case from most of the cases cited by respondent. See Hecht v. United States, 54 F. 2d 968 (Ct. Cl., 1932); American Lithofold Corp., 55 T.C. 904 (1971). They also create a strong inference that the payments were made for valid business reasons. With the clear vision of hindsight, the payments to Abbott in each year appear to us to have been unwise, but they do not appear to have been unreasonable. Fumigators did receive some tangible benefit from the payment by the presence of Pressman or another employee of Abbott at various conferences, and it received an intangible benefit in having Abbott ready to help if its insurance were concelled or if *253 it needed assistance in preparing bids. Because Abbott had provided substantial services in the immediately prior years, we do not think that petitioner could foresee that such services would not be provided during the years in issue. We have found no case which disallows a deduction merely because the taxpayer failed to receive an expected quid pro quo for an expense payment. In this case the payments to Abbott were not unusual for petitioner's type of business, and they were expected to be helpful. We believe that section 162 requires no more and hold the payments to Abbott to be deductible. Decision will be entered under Rule 50. 33