PRENTISS BALL AND LOUISE F. BALL, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ball v. Commissioner
Docket Nos. 2273-78, 7999-79, 8000-79.
United States Tax Court
T.C. Memo 1982-474; 1982 Tax Ct. Memo LEXIS 272; 44 T.C.M. (CCH) 863; T.C.M. (RIA) 82474; August 16, 1982. *272 Held: (1) Petitioners' unreported income determined. (2) Expenses attributable to unreported income determined. (3) Amount of constructive dividends inuring to controlling shareholder's benefit determined. (4) Amount of business purchases determined. (5) Certain alleged commission expenses disallowed. (6) Certain travel expenses, depreciation expenses and a casualty loss deduction disallowed for lack of proper substantiation. (7) Deductions claimed for feed expenses sustained. (8) Deductions claimed for dead cattle denied. (9) Freight expenses are disallowed. (10) Part of the underpayments for each of the years in issue was due to fraud. (11) Respondent's Motion for Partial Summary Judgment respecting petitioner's prayer for attorneys' fees is granted. Prentiss Ball, pro se. Frank Simmons, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: In these consolidated cases respondent determined the following deficiencies and additions to tax: Docket No.
Name
Year
Deficiency
2273-78
Prentiss and
1970
[3] $25,236.75
Louise F. Ball
1971
58,482.90
1972
100,656.02
7999-79
Prentiss and
1973
253,900.36
Louise F. Ball
1974
366,225.79
1975
80,222.05
1976
230,067.74
8000-79
Dixie Culvert
3/31/76
168,574.83
Manufacturing
3/31/77
50,116.71
Company, Inc.
Additions to Tax
Sec.
Sec.
Sec.
Docket No.
6651(a) [2] *273 6653(a)
6653(b)
2273-78
$12,618.38
29,241.45
50,328.01
7999-79
126,950.18
183,112.90
$4,011.10
$46,013.55
11,667.04
800-79
84,287.42
25,058.36 Due to concessions the issues presented for our determination are: (1) Whether petitioners had unreported gross receipts for the years 1970-1974 and for the years ended March 31, 1976, and March 31, 1977. (2) Whether petitioners Prentiss and Louise F. Ball received constructive dividends from Dixie Culvert Manufacturing Company, Inc. during 1975 and 1976. (3) Whether petitioners overstated business purchases for 1970-1973, 1975 and for the year ended March 31, 1977. (4) Whether the individual petitioners herein overstated commissions paid in 1971. (5) Whether commission expenses for 1974 claimed by Prentiss and Louise F. Ball should be disallowed for lack of substantiation. (6) Whether the following deductions claimed by petitioners Prentiss and Louise F. Ball should *274 be disallowed for lack of substantiation: (a) Travel expenses for 1974. (b) Depreciation expense for 1970-1972. (c) Expense for cattle feed and deduction for dead cattle in 1973 and 1974. (d) Casualty loss for 1971. (e) Freight expense for 1973. (7) Whether petitioners [4] are liable for the addition to tax provided by section 6653(b) for each of the years in issue. [5] Should we determine that petitioner Prentiss Ball is not liable for the fraud penalty of section 6653(b) for 1975 and 1976, then we are asked to determine whether the individual petitioners are subject to the negligence penalty of section 6653(a) for 1975 and 1976 and the late filing penalty of section 6651(a) for 1976. Additionally, we must address respondent's Motion for Partial Summary Judgment respecting petitioner's *275 request for attorneys' fees in docket Nos. 2273-78 and 8000-79. FINDINGS OF FACT Some of the facts have been stipulated. These facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioners Prentiss and Louise F. Ball were residents of Magnolia, Mississippi, at the time they filed their petitions herein. They filed joint Federal income tax returns for the years 1970 through 1976 with the Internal Revenue Service Center in Chamblee, Georgia. Dixie Culvert Manufacturing Company, Inc. (Dixie), the corporate petitioner herein, was organized under the laws of the State of Mississippi, with its principal office and place of business in Magnolia, Mississippi.Dixie filed its Federal income tax returns for the years ended March 31, 1976, and March 31, 1977, with the Internal Revenue Service Center in Chamblee, Georgia. We initially note the horrendous methods of record keeping employed by Ball and Dixie. These sub-par practices have made the task of ascertaining petitioners' precise tax liabilities a grave one. Some of the poor bookkeeping practices will be specifically alluded to herein. Additionally, we believe that petitioners employed significant *276 sums of cash in order to acquire steel and pipe. These purchases were not deducted on petitioners' tax returns upon the advise from the company's accountant to avoid showing significant losses on tax returns and possibly invite governmental scrutiny of company operations. It will become evident, however, that the losses which the company was hesitant to reveal, were not the result of unsuccessful operation but were rather a consequence of the huge amounts of unreported income. From January 1, 1964, to January 1, 1968, petitioner Prentis Ball (Ball) served as a county supervisor for Pike County, Mississippi. County supervisors were engaged primarily in the maintenance of highways and roads. Each county had five supervisors each of whom represented a different district. Ball, as county supervisor, acted as a purchasing agent in the county's acquisition of metal culverts. As a result of his position, Ball made the acquaintance of numerous other county supervisors. Metal culverts are made from galvanized steel and are utilized for drainage under roads, highways and streets. Counties and cities as well as private citizens constitute a major portion of the purchasing market. After *277 his experience as a county supervisor, Ball entered the business of the manufacture of metal culverts. From 1970 through March 31, 1975, Ball operated the metal culvert business as a sole proprietorship under the name of Dixie Supply Company. Effective April 1, 1975, Dixie Supply Company was incorporated under the name of Dixie Culvert Manufacturing Company, Inc. Except for the change to corporate form and the name change, the business of the manufacture and sale of metal culverts continued without interruption or change in method of operation. During the years ended March 31, 1976, and March 31, 1977, Ball was the president of Dixie. He owned 99-1/2 percent of the corporate stock while his two children each owned 1/4 percent of the stock. County supervisors were often wined and dined by those interested in selling their wares. Ball, as a culvert manufacturer, found it necessary to so entertain county supervisors. The income tax returns of Ball for the years 1970-1976 and Dixie's corporate tax returns for the years ended March 31, 1976, and March 31, 1977, were prepared by R. S. Brock, Sr., Public Accountant, from information provided him by Ball. When Brock was first retained *278 by Ball in 1970 he instructed Ball, through his employee Jo Ann Reeves, to deposit all of his income to his business bank account.This advice was reiterated by Brock upon the incorporation of the business. Ball did not deposit all receipts in the account and failed to so notify his accountant. Brock also recommended that all sales invoices be gathered so that proper accounting could be effected. Jo Ann Reeves worked for Ball from August 1972 through the fiscal year ended March 31, 1977. She accepted telephone orders, typed up invoices, executed other general secretarial duties and checked shipment trucks to make sure they were properly loaded. As each invoice was paid she pulled it from a file, marked it paid and put it in a separate file. Sales invoices so filed were not prenumbered. Reeves received payment from customers by check and by cash. Her custom was to give the checks and the cash to Ball. Occasionally she made up bank deposit slips for the payments at Ball's request. Reeves did not list the deposits so as to correlate payments received with deposits. When Brock, Ball's accountant, posted the books and prepared the returns for Ball's culvert manufacturing business *279 he dealt primarily with Reeves. Reeves would give Brock the sale invoices that were marked paid and the bank statements of the business. Whatever she gave Brock was at the direction of Ball. From 1973 onward Brock used the sales invoices of the business to record income. For 1970, Brock was furnished with a cash ledger and general ledger maintained by Ball or his employee from which Brock obtained the figures for income tax preparation. For the year 1971, Brock was furnished with bank statements and cancelled checks from which a summary was made. This summary was used as the basis for the return preparation. For the year 1972, Brock's employees maintained a cash journal and general ledger for the Dixie Supply Company. Entries to the cash journal were made from monthly bank statements, cancelled checks and check stubs. Income figures were gathered from deposits shown on the statements and from deposit slips when available. Information for the tax return was taken from these entries and from the general ledger. To reflect an accrual method of accounting in each year, Brock made adjusting entries for accounts receivable and accounts payable. Paid expenses were recorded from *280 cancelled checks. Among the payments recorded and deducted for tax purposes were amounts transferred to county supervisors. During the years when Brock recorded sales from sales invoices he did not verify whether bank deposits made by Ball or by Dixie equaled the amount of sales he recorded. During 1972 Ball opened an account at Peoples Bank of Mississippi in Merdian, Mississippi. From March 7, 1972, through December 5, 1972, Ball cashed checks totaling $42,956.74 which were made payable to Dixie Supply Company. These checks represented payments from Lauderdale County, Mississippi, to Dixie Supply Company for metal culverts. During the investigation of Ball's income tax returns for 1970, 1971, and 1972, respondent's special agent or his aide visited the chancery clerk's offices in all of the counties in Southern Mississippi and examined disbursement records. The special agent scheduled all payments by the counties to Dixie Supply Company. The parties agree that the following amounts received from Mississippi counties in 1970-1972 represent gross receipts of the Dixie Supply Company: 1970 --
$92,613.60
1971 --
159,103.94
1972 --
233,771.13
Additionally the parties could not agree on *281 the status of the following amounts which represent checks from counties for the period 1971 and 1972: 1971 --
$1,184.55
1972 --
33,675.23
Dixie Supply also conducted business with other governmental bodies and private entrepeneurs. For the years 1970-1972 Ball furnished leads to respondent's agents as to the identity of these entities. Respondent's agent followed up these leads by contacting persons involved and obtaining verification of sales, usually in the form of cancelled checks. The amounts received from the relevant entities in the period 1970-1972 were as follows: 1970 --
$734.94
1971 --
35,808.13
1972 --
101,029.78
Included in the above amounts are $12,068.36 and $42,161.20 paid by Rebel Products to Dixie Supply Company in 1971 and 1972 respectively. These amounts represented payments for steel and workmanship. Dixie Supply made no profit on these transactions as Rebel Products was charged only for Dixie Supply's costs for steel and labor. Ball engaged in these transactions in slack periods to keep his labor force busy in order to have them available for profitable operations. For the years 1973 through 1976 respondent's revenue agent scheduled from retained invoice copies the *282 names of Prentiss Ball's customers, other than counties. Respondent's agent then visited all of the Mississippi counties and Louisiana parishes with which Ball conducted business and scheduled payments from the counties and parishes to Dixie Supply for the period 1973-1976. The same procedure was followed respecting Dixie Culvert Manufacturing Company, Inc. for the years ended March 31, 1976, and March 31, 1977. Respondent's investigation revealed the following data concerning the gross receipts of Dixie Supply Company for 1973 and 1974 from Mississippi counties and Louisiana parishes: 1973 --
$603,517.96
1974 --
953,232.67
For the years 1973 and 1974 Dixie Supply Company had gross receipts of $69,444.51 and $45,047.14 respectively from customers other than counties and parishes. These figures were obtained from the paid invoice file of the Dixie Supply Company. Dixie's accountant, Brock, was furnished with a paid invoice file from which he recorded sales. Brock discovered that the cash account did not reflect the volume of sales he recorded. For March 31, 1975, and for March 31, 1976, Brock drew up a balance sheet. There were amounts of approximately $125,000 for March 31, 1975 *283 and $232,430.09 for March 31, 1976, listed as cash on hand. When Brock inquired in 1975 and 1976 as to whether Ball had this amount of cash on hand he was told that there was no cash on hand as expenses were paid with it. Approximately $23,000 of the $125,000 discrepancy in the March 31, 1975, amount was charged to Ball's drawing account. The remaining $102,026.57 was charged to purchases. The 1976 discrepancy in the cash account was eliminated by Brock's adjusting entry debiting sales and crediting cash for $232,430.09. Brock did not verify the accuracy of his entries but rather relied on "their word." Brock further reduced sales by $55,694.63 for the year ended March 31, 1976. No explanation of this adjustment was offered. A similar discrepancy in Dixie's cash account was found by Brock for the year ended March 31, 1977. In that year he increased purchases and decreased cash in the amount of $84,311.81 so as to remove the discrepancy. There was no basis for this adjustment. Respondent's agent also made the following adjustments to Dixie's income for the years ended March 31, 1976, and March 31, 1977: 3/31/76
3/31/77
Sales made to counties and
parishes which were not
disclosed to Dixie's
accountant
$ 71,116.66 $ 32,427.91 Sales represented by invoices
which were not posted to
Dixie's books
31,237.88 22,046.29 Sales posted but not paid
$ (19,652.38)
$ (15,390.00)
Math errors
(5,606.62)
(3,473.74)
Sales Duplicated
(6,285.46)
*284 Based on the above adjustments to Dixie's income and on Ball's control of the corporation respondent's agent determined that amounts ascribed as income to Dixie represented constructive dividends to Ball as follows: 1975
1976
Sales not furnished to
Dixie's accountant
$32,672.52 $ 66,825.31 Sales adjustments made
by the accountant
288,124.72 Sales not posted by the
accountant
28,117.92 22,614.93 Sales posted but not paid
(17,588.70)
(17,453.68)
Math errors
(5,606.62)
2,473.74 Sales duplicated
(953.54)
Total constructive
distributions to
Prentiss Ball
$37,595.12 $361,631.48 Respondent then determined that Dixie had sufficient earnings and profits so that the total distributions noted above should be characterized as dividends to Prentiss Ball. During the years in issue Ball engaged in the purchase of gold coins and silver. On four occasions during 1976 Ball purchased gold coins for a total price of $100,750 from the Gulf States Coin Exchange of New Orleans. This amount was paid in cash. Purchases
At the end of 1970, 1971 and 1972 an adjusting entry to the books of Dixie Supply was made. The adjustment reflected alleged cash purchases made for the year. Respondent disallowed certain purchases for *285 lack of substantiation. The purchases of materials claimed by Ball and those allowed by respondent for 1970-1972 are as follows: 1970
1971
1972
Purchases claimed
$21,949.16
$66,885.30
$145,549.96
Purchases allowed
15,792.64
51,964.10
114,199.81
$ 6,156.52
$14,921.20
$ 31,350.15
In 1973 there were the following entries on the books of Dixie Supply: Date
Payee
Amount
1/31/73
Walt Dellum
$20,867.65
10/18/73
A&J Dozer Service
1,321.00
11/ 1/73
A&J Dozer Service
4,190.30
12/ 6/73
R. L. Hart
750.00
12/17/73
A&J Dozer Service
1,123.00
$28,251.95
These amounts were included as purchases on Ball's 1973 return and were disallowed by respondent for lack of substantiation. Other Deductions
The following items were deducted by Ball on his returns and were disallowed by respondent in his notice of deficiency for lack of substantiation: 1. 1971. Commission expense -- Two payments to R. L. Hart totaling $2,500. 2. 1971. Casualty loss of $10,900 respecting an alleged fire of January 3, 1971, which damaged Ball's home and mobile home.
3. 1970-1972. Depreciation expenses of $2,326.54, $2,551.99, and $2,133.96 respectively. 4. 1974. Commission expense -- One payment of $4,385.42 to Wesley Ball, a university student and the granddaughter *286 of Prentiss Ball, for summertime work and a payment of $1,000 to J. D. Bradford.
5. 1974. Travel expense of $2,071.25. 6. 1973 and 1974. Cattle feed expenses of $7,682.26 and $15,473.34 respectively incurred in Ball's Red Brahman cattle business. Death of cattle in the amounts of $7,875 and $6,000, respectively. 7.1973. Freight expenses of $12,523.03 were disallowed because it was not established that they were ordinary and necessary business expenses. On June 21, 1976, a criminal information was filed against Prentiss Ball in the United States District Court for the Southern District of Mississippi. The information charged Ball with willfully making and subscribing false income tax returns for the years 1971 and 1972 in violation of section 7206(1). The information alleged that Ball knew that he received substantial gross receipts in excess of that reported on his income tax returns. Ball pled Nolo Contendere and was found guilty of violating section 7206(1). Respondent asserted that at least part of the underpayments for all years involved herein was due to fraud.The allegation of fraud against Prentiss Ball for 1975 and 1976 was first raised in respondent's answer to *287 the petition. OPINION 1. Gross Receipts for the Years 1970-1974 and for the Years Ended March 31, 1976, and March 31, 1977.
After a stint as supervisor of Pike County, Mississippi, petitioner Prentiss Ball entered the business of the manufacture and sale of metal culverts. The establishment of Ball's business was directly attributable to the experience and knowledge of the culvert industry which Ball acquired as a county supervisor. The business was conducted as a sole proprietorship from 1970 through March 31, 1975, and was incorporated on April 1, 1975. Ball owned 99-1/2 percent of the corporate stock. Ball concedes that he failed to report the proper amount of gross receipts derived from the sale of metal culverts during the years in issue. Ball admits that for each year in issue he did not deposit all business receipts into Dixie's bank account and that he did not inform his accountant of this fact. As petitioner did not maintain adequate records, respondent used records maintained by third parties and any paid sales invoices maintained by Dixie in order to tabulate gross receipts of the business. A taxpayer is required to maintain such records as will enable him to file *288 a correct return. Section 6001; section 1.446-1 (a)(4), Income Tax Regs. Should this requirement not be met, the Commissioner may adopt such method of reconstrucing income as in his opinion clearly reflects income. Section 446(b). In the instant case respondent's agents adopted the following procedure for the reconstruction of Prentiss Ball's income for the years 1970-1972: 1. After examining some sales invoices maintained by Dixie, the agents determined that a substantial portion of sales were to Mississippi counties. The agents then visited the chancery clerk's office in each county in the southern portion of Mississippi in order to examine county disbursement records. Each disbursement by a county to Dixie Supply Company was then recorded and a copy of the county's warrant (check) was made. 2. Upon inspection of Dixie Supply Company invoices, the agent discovered the names of customers other than Mississippi counties. These customers were then contacted and verification of transactions with Dixie Supply Company (usually in the form of checks) was obtained. In order to reconstruct Ball's income for the years 1973-1976 and the income of Dixie for the years ended March 31, *289 1976, and March 31, 1977, respondent's agents proceeded as follows: 1. Mississippi counties and Louisiana parishes were visited and disbursements to Dixie Supply Company and Dixie were scheduled. A copy of each warrant (check) evidening such disbursement was made. 2. Sales to customers other than counties and parishes were recorded through an examination of Dixie's paid invoice file. Thus, the agents tabulated these sales by merely adding the amounts which were listed on invoices that Dixie marked "paid." While on occasion, an invoice would indicate the name of a county supervisor without the name of a county, respondent's agent was able to eliminate such invoices from the private customer category through the knowledge gained by visiting counties.To the best of the agent's ability, this provided the mechanism to avoid including the same sale once on the list of sales to counties and once on the list of sales to other customers. A. 1970 - 1972
Respondent presented checks evidencing the following amount of payments from counties to Dixie Supply Company for the years 1970-1972. 1970 --
$92,613.60
1971 --
160,288.49
1972 --
[6] *290 268,245.16
Of these amounts, Ball admits that $92,613.60, $159,103.94 and $233,771.13 for the 3 respective years constitute gross recepits of the business. Ball has introduced no credible evidence which points to the exclusion from gross receipts of the residue. In view of the burden of proof imposed upon petitioner herein, Rule 142(a), Tax Court Rules of Practice and Procedure, we find that the amounts asserted by respondent and noted above constitute gross receipts of the business for 1970, 1971, and 1972. Dixie Supply Company also received the following amounts from customers other than counties for the years 1970-1972: 1970 --
$734.94
1971 --
[7] *291 35,808.13
1972 --
[7] 101,029.78
In view of respondent's introduction of evidence to support these figures and petitioner's failure to prove that these amounts were not gross receipts of the business, we hold that these amounts constitute gross receipts of the company for the period 1970-1972. B. Gross Receipts for 1973 and 1974.
Based on respondent's agents' inspection of the disbursement records of Mississippi counties and Louisiana parishes, respondent determined that the following payments to Dixie Supply Company were made during 1973 and 1974: 1973 --
$603,517.96
1974 --
953,232.67
Petitioner did not rebut the presumption of correctness resting in respondent's favor other than to vaguely allege that his gross receipts could not have been so extensive as respondent asserts. Accordingly, we hold that the above amounts constitute gross receipts of Dixie Supply Company for the years 1973 and 1974. Respondent further maintains that $69,444.51 and $45,047.14 constitute gross receipts of the business obtained through transactions *292 with customers other than counties and parishes. These figures were tabulated from the paid invoice file of the business. Ball has not explained why these amounts should not be considered gross receipts and we therefore view these amounts as gross receipts of the business. C. Gross Receipts for the Years Ended March 31, 1976, and March 31, 1977.
Respondent's agent made the following adjustments to Dixie's gross receipts: 3/31/76
3/31/77
Sales made to counties and
parishes which were not
disclosed to Dixie's
accountant
$71,116.66 $32,427.91 Sales represented by
invoices which were
not posted to Dixie's
books
31,237.88 22,046.29 Sales posted but not paid
(19,652.38)
(15,390.00)
Math errors
(5,606.62)
(3,473.74)
Sales duplicated
(6,285.46) These adjustments were made after examination of county and parish disbursement records and company invoices. Petitioner offered no credible rebuttal to respondent's adjustments. Thus, we uphold respondent as to the above adjustments. Dixie's sales should be increased further for the year ended March 31, 1976, by the amount of $288,124.72. This increase is justified in light of the accounting entries made by petitioner's accountant, Brock, resulting in the decrease *293 of recorded sales in 1976. Brock, after considering recorded sales arrived at an accounting balance in the cash account, which, upon inquiry, was discovered to be significantly in excess of the actual cash balance in the bank account.Thus, the accounting entries served merely to eliminate the discrepancy between cash per books and cash on hand. There was admittedly no actual reduction in sales for the year ended March 31, 1976. 2. Expenses Attributable to Increased Income.
Our findings indicate that Ball and Dixie failed to claim certain expenses for purchases of steel and pipe and truckmen's expenses in order to avoid showing a loss on their income tax returns. Considering that we have found that Ball and Dixie enjoyed significant amounts of unreported income we now turn to the issue of additional deductible expenditures. Petitioners, in their quest for increased deductions, submitted a long list of types of business expenditures incurred by them. Unfortunately for petitioners they list no amounts or dates of expenditures and submit no receipts or checks evidencing the listed expenses. Moreover, we have no means by which to discern whether amounts expended for most of the purposes *294 designated have been accounted for through deductions already taken by petitioners on their income tax returns. However, Ball did testify that certain amounts he paid to truckmen as expenses for their journeys were not deducted on tax returns. Ball asserted that a truckman was paid $60 for expenses for each long trip taken and somewhat less for shorter trips. We find this testimony to be credible and believe that an approximation of the total annual truckmen's expense not deducted by petitioners is in order. Cohan v. Commissioner,39 F.2d 540 (2nd Cir. 1930).
We have examined petitioners' depreciation schedules and other tax information in an attempt to determine how many trucks were employed, how many truckmen were employed and how many trips per year were made. Realizing that our conclusion can only be a best guess, we bear heavily upon the taxpayers herein whose inexactitude is of their own making. Cohan v. Commissioner, supra. We hold that for 1970-1972 Ball expended $20 per day, 5 days a week or $5,200 per year for truckmen's expenses. For 1973, 1974 and for the years ended March 31, 1976, and March 31, 1977, we hold that Dixie expended $40 per day, 5 days per week or $10,400 *295 per year for truckmen's expenses. We are also convinced that petitioners incurred expenses for purchases which offset their unreported sales.Despite the lack of specific evidence of amounts expended for steel and pipe, we feel certain that the tremendous amount of unreported sales involved herein was accompanied by purchases which were not claimed by petitioners. This conclusion is buttressed by our notion that petitioners, considering the extent of their understatements of gross receipts, did not want to show any loss from operation so as to minimize the potential of governmental scrutiny of their business. First, we address the unreported sales of Dixie Supply Company to Rebel Products amounting to $12,068.36 and $42,161.20 in 1971 and 1972 respectively. Those sales, while properly reportable as gross receipts, did not result in any profit to Dixie Supply Company. Dixie Supply Company engaged in the transactions in order to maintain its work force. Accordingly, deductions of $12,068.38 in 1971 and $42,161.20 in 1972 are appropriate. Regarding all other unreported sales for the years in issue, it is abundantly clear that there is no way to accurately determine the proper amount *296 of steel and pipe purchases which have gone unreported. We therefore resort to the Cohan principle. See Estate of Stein v. Commissioner,25 T.C. 940, 957 (1956), affd. sub nom Levine v. Commissioner,250 F.2d 798 (2nd Cir. 1958). Accordingly, we conclude that 25 percent of the unreported sales for each year constitute unreported purchases. 3. Constructive Dividends.
Sections 301 and 316 provide that a distribution of property made by a corporation to a shareholder with respect to its stock shall be treated as dividend to the extent of the earnings and profits of the corporation. Where controlling stockholders divert corporate income to themselves, such diverted funds should be treated as constructive dividends. Simon v. Commissioner,248 F.2d 869 (8th Cir. 1957); Dawkins v. Commissioner,238 F.2d 174 (8th Cir. 1956); Chesbro v. Commissioner,21 T.C. 123 (1953), affd. 225 F.2d 674 (2nd Cir. 1955). Ball has conceded that during Dixie's fiscal years ended March 31, 1976, and March 31, 1977, he did not deposit all business receipts from the operation of the business into the corporation's bank account. Additionally, respondent through inspection of company invoices and county disbursement *297 records, has shown that the understatements of corporate sales were $37,595.12 for the calendar year 1975 and $361,631.48 for the calendar year 1976. We believe that the above amounts were transferred into Ball's hands. This belief is based on the following findings: 1. Ball admitted he did not deposit all business receipts into the company bank account. 2. Ball engaged in the purchase of gold coins and silver. During 1976 he paid $100,750 in cash for coins. Ball alleges that he purchased the coins for others. He maintains that a certain individual, whose name he does not recall, came to his office one day and left a shoebox full of $100 bills totaling over $100,000 without getting a receipt for the money. This story is not worthy of belief. Accordingly, we believe that the cash represented amounts received by Ball from company operations and not deposited to the company bank account. 3. When Brock, the company accountant, inquired as to certain imbalances in the company's cash account he was told that nondeposited cash was used for expenses. However, we are inclined to think that not all of the gross receipts of the business represented by unreported sales should be viewed *298 as constructive dividends to Ball. In regard to the issue of expenses attributable to the unreported sales, we held that 25 percent of unreported sales represented unreported purchases of pipe and steel. We deem it most reasonable to assume, as Ball alleges, that some amounts of gross receipts that he did not deposit to the corporate bank were used for these purchases. Again resorting to the Cohan principle, we hold that 25 percent of the amounts asserted by respondent as corporate distributions for 1975 and 1976 were paid by Ball for steel and pipe. Accordingly, only 75 percent of the amounts deemed distributed to Ball by the corporation were distributed with respect to his corporate stock. The other 25 percent represented amounts expended by the corporation for purchases of steel and pipe for which Ball, its majority stockholder, acted merely as a conduit. 4. Overstatement of Business Purchases.
Respondent disallowed the following purchases claimed by petitioners: 1970 --
$6,156.52
1971 --
14,921.20
1972 --
31,350.15
1973 --
28,251.95
1975 --
102,026.57
3/31/77 --
84,311.81
The reason for the disallowance of the purchases claimed for 1970-1973 was lack of substantiation. The 1975 amount *299 and the amount for the year ended March 31, 1977, were disallowed by respondent in view of the fact that accounting entries made by Brock debiting purchases and crediting cash were made merely for the purpose of squaring the company's cash account per books with the company's actual bank account balance. Petitioner bears the burden of proving that respondent's determination is erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In the section of this opinion reserved for a discussion of expenses attributable to unreported sales, we held that 25 percent of such unreported sales represented unreported amounts expended for steel and pipe. To the extent that any of the purchases claimed above exceeds this allowance for purchases, we hold that petitioners have failed to sustain their burden of proof. 5. Commission Expenses -- 1971 and 1974.
Respondent disallowed the following commission expenses claimed by petitioner Prentiss Ball: 1971 --
$2,500.00
1974 --
5,385.42
The 1971 claim represents two checks payable to R. L. Hart. The 1974 claim constitutes one payment of $4,385.42 to petitioner's granddaughter and a payment of $1,000 *300 to J. D. Bradford. Respondent disallowed these claims for failure to prove the business purpose of the expenses. Petitioner testified that payments to Hart in 1971 were for pipe which was bought in Hart's name. Considering that there is some question as to the propriety of these payments [8] to Hart we cannot accept this naked assertion as a basis for the deduction. Accordingly, respondent's disallowance of the deduction is upheld.
As to the 1974 claims, we must sustain respondent's position. Ball stated that the payment to this granddaughter was for work she performed on her summer vacation from college. What has not been explained is why she received one lump sum check for her summertime work when Ball let her work in the office to "catch on [to] things." We find this lump sum payment somewhat unusual for the alleged circumstances. Accordingly, petitioner has failed to prove his entitlement to a deduction. Ball introduced no evidence as to the $1,000 payment to Bradford. Therefore, we sustain respondent's disallowance of the deduction. 6. Various Claimed Deductions.
Respondent disallowed the following deductions for lack of substantiation: 1974 --
Travel expense of $2,071.25
1970-1972 --
Depreciation expenses of $2,326.54, $2,551.99
and $2,133.96, respectively
1971 --
Casualty loss of $10,900
1973-1974 --
Cattle feed expenses of $7,682.26 and
$15,473.34, respectively and death of
cattle $7,875 and $6,000 respectively
A. *301 Travel Expense
Ball introduced no evidence in support of the claimed deduction. Accordingly, the deduction is disallowed. Rule 142(a), Tax Court Rules of Practice and Procedure.
B.Depreciation Expenses
Petitioner again failed to explain the depreciation claimed. In addition, respondent's agent testified that his investigation of petitioner could not uncover the existence of certain assets for which depreciation was claimed.Therefore, respondent's position is upheld. C. Casualty Loss
Petitioner alleges that his mobile home and trailer were destroyed by fire in 1971. He has submitted no proof of the casualty or the amount of his loss. Therefore, the deduction for a casualty loss is denied. D. Feed Expenses and Dead Cattle
Petitioner ran a Red Brahman cattle operation during 1973 and 1974. Certain claimed feed expenses were disallowed by respondent for a lack of proof regarding the expenditures. Petitioner's employee, Jo Ann Reeves, testified that she made out checks for feed and inserted the purpose of the expenditures on the checks. She testified as to the payee company. The relevant checks have been misplaced. We believe Reeves' statements to be credible and accordingly *302 petitioner's deductions for feed expenses in 1973 and 1974 are sustained. Petitioner submitted no proof regarding the death of cattle in 1973 and 1974. Therefore, the deductions are denied. E. 1973 Freight Expenses
Respondent denied these expenses on the grounds that petitioners had failed to show they were ordinary and necessary business expenses. No proof was offered by petitioners. These expenses are denied. 7. Fraud.
Section 6653(b) provides that if any part of an underpayment is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In order to sustain a determination of fraud, respondent must prove, by clear and convincing evidence, that some part of the underpayment for the tax year involved is due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Stone v. Commissioner;56 T.C. 213 (1971); Otsuki v. Commissioner,53 T.C. 96 (1969). The intent required for the imposition of the fraud penalty encompasses a specific purpose to evade a tax believed to be owing. McGee v. Commissioner,61 T.C. 249 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Although fraud is never to be imputed or presumed, Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959), *303 circumstantial evidence and reasonable inferences are permissible bases upon which fraud may be found. Stoltzfus v. United States,398 F.2d 1002 (3rd Cir. 1968); Stone v. Commissioner,supra at 214. Respondent has asserted fraud for each of the years involved herein. While we are dealing with an individual taxpayer (Prentiss Ball) for the years 1970-1976 and a corporate taxpayer (Dixie) for the years ended March 31, 1976, and March 31, 1977, we look to the actions and intentions of Prentiss Ball for all of the years in issue. His conduct, as president of Dixie and owner of 99-1/2 percent of its stock, is to be imputed to petitioner, Dixie, for the years ended March 31, 1976, and March 31, 1977. See American Lithofold Corp. v. Commissioner,55 T.C. 904, 925 (1971); Federbush v. Commissioner,34 T.C. 740, 749 (1960), affd. 325 F.2d 1 (2nd Cir. 1963). The evidence clearly establishes that during each of the years in issue the petitioners grossly understated their gross receipts. While we have found that there were some unreported expenses attributable to the unreported receipts, we have little doubt that a major portion of the receipts represented the profit margin of the taxpayers. *304 This notion is buttressed by the fact that during the years in issue Ball engaged in the purchase of gold coins. In 1976 he paid over $100,000 in cash for coins. Ball insists that the cash belonged to others for whose account the coins were brought. Considering that Ball could not remember the name of the person who allegedly left over $100,000 in $100, bills at Ball's office, we find the story simply unbelievable. Other efforts by Ball to skim receipts of the business are evidenced by his diversion of checks payable to Dixie Supply in 1972 in the amount of $42,956.74 into his personal bank account. Furthermore, Ball concedes that during all the years in issue he did not deposit all business receipts into the company bank account. Indeed, his failure to so notify his accountant casts significant doubt on the propriety of this action. Thus, the consistent pattern of underreporting substantial amounts of income over a period of several years is persuasive evidence of fraud. Holland v. United States,348 U.S. 121, 139 (1954); Harper v. Commissioner,54 T.C. 1121, 1139 (1970). We further find that petitioners' method of bookkeeping and maintaining records serves as evidence of fraud *305 for each of the years in issue. See Webb v. Commissioner,394 F.2d 366, 379 (5th Cir. 1968), affirming a Memorandum Opinion of this Court; Baumgardner v. Commissioner,251 F.2d 311 (9th Cir. 1957), affirming a Memorandum Opinion of this Court. First, as already noted, not all receipts were deposited to the business bank account. Moreover, whatever deposits were made were not correlated with any payments received from customers. Sales invoices were not prenumbered so that there was no way of knowing if an invoice was missing. Additionally, there were sales which were represented by invoices which were not posted to the company books. Ball's accountant, Brock, told him to deposit all business receipts to the business bank account. Ball did not follow these instructions and did not so notify Brock. Brock was given the company bank statements in order to prepare Ball's tax returns for 1970-1972. For subsequent years, Brock was given company sales invoices from which he prepared tax returns. He did not verify the figures obtained from invoices by examining bank statements because he assumed that Ball was following his directive to deposit all business receipts into the company account.As *306 Ball was obviously aware that Brock was preparing returns with insufficient information, we find these facts to be supportive of the proposition that for each of the years in issue Ball intended to evade a tax believed to be owing. We find further support for the imposition of the fraud penalty by the fact that the taxpayers' maintenance of poor records was coupled with significant dealings in cash. We believe that the combination of these factors in the instant case points to the concealment of income by petitioners. [9]
Accordingly, we sustain respondent's impositions of the fraud penalty for all of the years in issue. Respondent has moved for partial summary judgment in docket Nos. 2273-78 and 8000-79 respecting petitioners' prayer for attorneys' fees. This Court is without authority to award attorneys' fees to petitioners. Key Buick Co. v. Commissioner,68 T.C. 178 (1977), affd. 613 F.2d 1306 (5th Cir. 1980). Therefore, respondent's Motion for Partial Summary Judgment is granted. To reflect the foregoing *307 and concessions, An appropriate order will be entered in docket Nos. 2273-78 and 8000-79.
Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Prentiss Ball and Louise F. Ball, docket No. 7999-79, and Dixie Culvert Manufacturing Co., Inc., docket No. 8000-79.↩
3. The parties agree that the inclusion in the notice of deficiency of a 1970 farm loss of $2,141.90 was an error. The additional tax due attributable to the impropriety of this deduction has previously been assessed by respondent and paid by petitioners (see stipulation of facts).↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. 4. The parties have stipulated that in no event is Louise F. Ball liable for the fraud penalty imposed by section 6653(b). ↩
5. For the years 1970-1974 and for the years ended March 31, 1976, and March 31, 1977, the fraud penalty imposed by section 6653(b) was asserted by respondent in his notice of deficiency. The fraud penalty issue for 1975 and 1976 was raised by respondent in his answer to the petition.↩
6. The 1972 checks from counties which respondent introduced as evidence totaled $267,446.36. However, respondent's list of those checks (Exhibit Q) includes an additional check in the amount of $798.80. Considering the numbering respondent has assigned to photocopies of checks introduced as evidence (Exhibits S and 12-L) it is most plausible that the photocopy of the check for $798.80 was inadvertently omitted.
7. Included in the above amounts are $12,068.36 and $42,161.20 paid by Rebel Products to Dixie Supply Company in 1971 and 1972 respectively. These amounts represent charges for the cost of materials and labor. Dixie Supply Company did not profit from these transactions with Rebel Products. Our subsequent discussion of purchases addresses these transactions.
8. See section 162(c).↩
9. See Hershenson v. Commissioner,T.C. Memo. 1962-228 and Meyers v. Commissioner, a Memorandum Opinion of this Court dated August 31, 1953, affd. 218 F.2d 823↩ (4th Cir. 1955).