INNER-CITY TEMPORARIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Inner-City Temporaries, Inc. v. Commissioner
Docket No. 20968-84
United States Tax Court
T.C. Memo 1990-489; 1990 Tax Ct. Memo LEXIS 541; 60 T.C.M. (CCH) 726; T.C.M. (RIA) 90489; September 12, 1990, Filed *541 Decision will be entered under Rule 155. Bernard M. Kaplan, for the petitioner. John J. Comeau, for the respondent. PARKER, Judge. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioner's Federal corporate income tax and additions to the tax as follows: Addition to the Tax
Year
Deficiency
Under Section 6653(b)
1976
$ 37,534.78
$ 18,767.39
1977
97,533.59
48,766.80
Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years involved in this case, and all rule references *542 are to the Tax Court Rules of Practice and Procedure. After concessions by petitioner, [1] the issues remaining for decision are: (1) Whether petitioner had gross receipts in excess of $ 303,118.35 for 1977 and, if so, the amount thereof; (2) The correct amount of costs of goods sold (in the form of direct labor costs) for each year; and (3) Whether there was an underpayment of tax each year, and if so, whether the underpayment each year was due to fraud within the meaning of section 6653(b). *543 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and the exhibits attached thereto are incorporated herein by this reference. Petitioner Inner-City Temporaries, Inc. (hereinafter referred to as ICT or petitioner) is a corporation organized under the laws of the State of Illinois. At the time the petition was filed in this case, ICT had its principal place of business at 333 North Michigan Avenue, Chicago, Illinois. ICT was a cash-method taxpayer and filed its tax returns on the calendar year basis. At all pertinent times James P. (Perry) Spraggins has been the sole shareholder and the president and treasurer of ICT. James P. (Perry) Spraggins (hereinafter referred to as Spraggins) was born in the farming community of Cedar Bluff, Mississippi. He attended school in a one-room schoolhouse and did not graduate from grammar school until he was 19 years old, because he worked in the fields as a farmhand and could only attend school on an intermittent basis. In 1941 he moved to Chicago, entered the military service for 42 months, and was honorably discharged from the Army with the rank of Sergeant. Thereafter he attended Crane *544 Technical High School in Chicago at night and worked during the day as a watchman. He graduated from high school at age 29 or 30 and thereafter attended college under the GI Bill. He attended college off and on for over 25 years. His educational pursuit was beset by difficulties: remedial course work, failed courses, academic probation, and a general low grade average. However, he persevered and finally received his degree in business administration from Roosevelt University in 1978. He had taken courses in income tax and procedure, introduction to cost accounting, business law 1 and 2, and intermediate accounting. Spraggins' business career progressed more smoothly than his academic career. Over the years he has had a great deal of experience in managing small businesses. From his position as a watchman while attending high school, he was thereafter employed by the United States Post Office. In 1954 he incorporated his first business venture, a small family restaurant called "Perry's Barbecue," which is still in business. His mother worked in the restaurant while he was still working for the Post Office, but he performed all of the managerial functions for the business. *545 At all relevant times Spraggins has been the sole shareholder and president and treasurer of Perry's Barbecue. There was also a company called Perry's Enterprises, Inc., which is not otherwise described in the record. Also located next door to Perry's Barbecue was "Perry's Income Tax Service," which, Spraggins later explained to the Internal Revenue Service special agent, was "just a hobby." In 1965 Spraggins had founded "Perry's Maid Service," a temporary employment service in the domestic field. However, after about five years, he decided that Perry's Maid Service was a dead-end business, and that it was "a limited market in my analysis and didn't show any promise." He then decided to go into the commercial temporary employment service, in the clerical and industrial field. In that field there was a lot of competition from Kelly Girl, Manpower, Ready Man, and others. Spraggins decided to draw his work force from the black community and selected the name Inner-City Temporaries "because it had the connotation as a minority type operation." He decided to get his temporary clerical workers from the black community in the south and west sides of Chicago and to get his unskilled *546 labor (day laborers or common laborers) from those areas and from the Loop Area of downtown Chicago. Spraggins incorporated ICT in November of 1968, and he has always performed all of the managerial functions for that corporation. ICT's business was to supply temporary employees to various businesses and governmental agencies in the Chicago area. After 1975, ICT's business rapidly expanded after it was selected as the low bidder for the contract to supply temporary employees for the Bureau of Employment Security (BES) of the State of Illinois. ICT also obtained a lot of business from McCormick Place and the Hilton Hotel about that time. ICT has two offices -- an office on Harrison Street for the day laborers and a separate office, first on Jackson Street and later (beginning sometime in 1976) at 333 North Michigan Avenue, for the clerical workers. ICT paid the wages of the temporary employees and then billed its customers, the employers for whom the temporary employees performed services, for an amount in excess of what ICT had paid the employees. That excess amount above ICT's direct labor costs provided the funds for ICT's overhead and other operating expenses and for its *547 profit. While there may occasionally have been a part-time employee working at ICT's Harrison Street office, Spraggins essentially ran that office by himself. All of the temporary day laborers were recruited from that office. He recruited the temporary day laborers from the flophouses, bars, alleys, and streets of the Loop Area and from the south and west sides. Many of those temporary day laborers did not want any Federal or State taxes withheld from their wages, and they signed Forms W-4E so that none would be withheld. Also many of the day laborers only worked a few hours or perhaps a few days for ICT, so that no taxes needed to be withheld. The wages for the day laborers who signed the Forms W-4E and the others for whom no taxes were withheld would not be included in the wages reported on ICT's Forms 941, U.S. Employer's Quarterly Federal Tax Return. The wages paid to these so-called "exempt employees" would not appear on the Forms 941. However, the Forms 940, Employer's Annual Federal Unemployment Tax Return, had one line for exempt remuneration and another line for taxable wages. These day laborers were paid primarily by check and to a minor extent in cash. The record *548 does not establish that ICT generally paid any particular wage rate to the day laborers, nor does it establish the rate of pay that ICT in fact paid these day laborers, particularly those paid in cash. [2] *549 The record does not establish the amount of any cash payments of wages to day laborers in 1976 or 1977. [3]
The Jackson Street/North Michigan Avenue office of ICT (hereinafter referred to for convenience as the Michigan Avenue office) had from one to three women employees who performed clerical and bookkeeping work for ICT. The Michigan Avenue office handled all of the referrals of temporary clerical employees. The temporary clerical employees included secretaries, clerks, file clerks, and keypunch operators. ICT generally paid its temporary clerical workers more than it paid its temporary day laborers. However, the rate of pay depended upon the clerical worker's job classification and qualifications. When an employer-customer of ICT (hereinafter referred to as "customer") wanted a temporary employee, ICT would send the employee to the customer with a *550 job card, service slip, or work slip. At the end of the day or at least at the end of the work week, the customer would sign the work slip, indicating the number of hours each temporary employee had worked, and return the work slip to ICT. ICT's staff at the Michigan Avenue office would then record the number of hours worked (as shown on the work slips) in two places: on the payroll journal for purposes of ICT's payment of wages to the temporary employees and on the customer's ledger card which was used to bill the customer for the temporary employees supplied by ICT. ICT's staff at the Michigan Avenue office prepared invoices to the customers, taking the names of the employees and hours from the work slips and customer ledger cards and the rate per hour charged to the customer from ICT's list of such customer rates. The rate ICT charged its customer depended on the terms of the agreement between ICT and the particular customer. [4] The invoice amount was posted on the customer's ledger card. When the customer paid that invoice, the amount of the payment was also posted on the customer ledger card. The ledger card showed the name and address of the customer and the lump-sum amount *551 charged the customer for the temporary employees ICT supplied. While the ledger cards showed the total hours worked by these temporary employees and what ICT charged the customer for these services, the ledger cards did not show what ICT itself paid those temporary employees. These customer ledger cards thus contained ICT's billings to its *552 customers and the customers' payments to ICT, and hence showed ICT's gross receipts for each year. ICT maintained no other record of its gross receipts. [5] Most, if not all, of the customer ledger cards, for both the clerical workers and the day laborers, were maintained by the ICT staff at the Michigan Avenue office. [6]
ICT's staff at the Michigan *553 Avenue office maintained a payroll journal showing the name of each temporary employee, the number of hours worked during the week, ICT's rate of pay to that temporary employee, and the total amount paid. The postings to the payroll journal were usually made on Fridays. Spraggins supplied the rate of pay for all of the temporary employees. The information posted in the payroll journal as to hours came from the work slips. For many of the day laborers, Spraggins telephoned the Michigan Avenue office each Friday morning and orally gave the staff the employee's name, number of hours worked, and rate of pay. All of the employees listed in the payroll journal, both clerical and day laborer, were paid by check. [7] Some other temporary employees were also paid by check, but those employees were not listed in the payroll journals. *554 ICT had three bank checking accounts, two of which were payroll accounts, and the third of which was a general corporate account. The general corporate bank account was account No. 21-1235-3 with the LaSalle National Bank. There was also a payroll account at the LaSalle National Bank, account No. 21-1234-2. ICT's other payroll account was account No. 052-681-9, at the Michigan Avenue National Bank. Spraggins was the only person authorized to write checks on these three checking accounts. The two payroll checking accounts reflect the following payroll checks issued in 1976 and 1977: 1976
1977
Michigan Ave. Nat'l Bank -
Payroll A/C #052-681-9
$ 142,805.71
$  72,306.38
LaSalle National Bank -
Payroll A/C #21-1234-2
78,988.52
30,223.78
Totals       $ 221,794.23
$ 102,530.16
The Michigan Avenue National Bank payroll account No. 052-681-9 was used at ICT's Michigan Avenue office to pay both temporary clerical workers and temporary day laborers, as well as ICT's own staff. The LaSalle National Bank payroll account No. 21-1234-2 was used at ICT's Harrison Street office to pay temporary day laborers. One of the problems Spraggins encountered *555 at the Harrison Street office with the day laborers was the matter of cashing paychecks. Spraggins did not keep cash on hand to cash the payroll checks, but he made arrangements with local bars and other businesses in the area to cash those ICT payroll checks. Spraggins paid temporary day laborers in cash in only a few instances, in what he regarded as emergencies. ICT had to pay its temporary clerical and day laborers on a current basis (daily or weekly), whereas there was a delay or lag time before ICT itself was paid by its customers, particularly by BES. For example, ICT received gross receipts from BES of $ 185,642.08 for all of 1976 and of $ 258,551.96 for the first half of 1977. The two payroll accounts were overdrawn at times during 1976, and when that happened Spraggins either transferred funds from the general corporate account or he deposited funds into the payroll accounts. He deposited some $ 17,500 into the payroll accounts in 1976. His wife also deposited $ 5,000 in the general corporate account that year. However, there is no indication that any portion of those advances of funds ($ 22,500) remained unreimbursed at the end of 1976. [8]
*556 The general corporate bank account was never overdrawn in 1976. At the end of 1976, ICT had cash on hand in the three bank accounts totaling $ 24,165.34. At the end of 1977, ICT's cash on hand in these three bank accounts totaled $ 185,891.87. Any cashflow problem ICT experienced was a temporary one in September and October 1976. As noted above, ICT's customer ledger cards were its only business record showing its gross receipts. Those customer ledger cards showed gross receipts of $ 289,440.15 for 1976 and $ 330,919.78 for 1977. In the criminal tax case, respondent's investigators obtained copies of most of the customer checks showing the customers' payments to ICT. However, while information as to the check number and amount was obtained from ICT's customers, it was not possible to secure copies of all of the customer payment checks. The customer payment checks for which copies were obtained showed gross receipts of $ 312,545.54 for 1976 and $ 321,381.29 for 1977. Those were the figures used in the criminal case. In this case the parties have now stipulated that ICT had gross receipts of at least $ 331,529.47 in 1976 and at least $ 303,118.35 in 1977. During *557 the years before the Court, all of ICT's customers paid ICT by check. Substantially all of those customer checks were deposited into one of the various ICT bank accounts. [9]
*558 On the Federal corporate tax returns, which Spraggins caused to be prepared [10] *559 and which he signed under penalties of perjury, ICT reported gross receipts of $ 216,770 for 1976 and gross receipts of $ 116,926 for 1977. Spraggins was aware that at the end of 1976 ICT had billed some $ 130,000 to its customers which had not yet been paid by those customers. Spraggins had one of the ICT staff determine that amount of "accounts receivable," but he did not report that portion of ICT's gross receipts on either the 1976 or the 1977 corporate return. See n.10, supra. On those returns ICT claimed costs of goods sold (direct labor costs) of $ 151,739 and $ 74,026 for the years 1976 and 1977, respectively. [11] On those corporate returns ICT's cash on hand was reported as $ 8,626 at the end of 1976 and $ 8,167.50 at the end of 1977. On its quarterly Forms 941 for 1976, ICT reported total taxable FICA wages paid as $ 174,323.97 for the year. That was also the total taxable wage amount that ICT reported on its Form 940, Employer's Annual Federal Unemployment Tax Return, for that year. Line 11 of the Form 940 entitled "Total remuneration (including exempt remuneration) PAID during the calendar year for services of employees" was left blank, as was the entire section on exempt remuneration. However, ICT paid wages by check in the total amount of $ 221,794.23 for that year, and that amount less the taxable wages of $ 174,323.97 reported on the *560 Forms 940 and 941 would leave a balance of $ 47,470.26 available as possible exempt wages for that year. On its quarterly Forms 941 for 1977, ICT reported total taxable FICA wages paid as $ 64,050.09. That was not the total amount reported on the Form 940 for that year. In this instance the information on exempt remuneration was filled in on the Form 940 for 1977, showing exempt income of $ 2,171.71, total taxable wages of $ 61,599.31, for total wages of $ 63,771.02, including exempt wages, for 1977. There is no explanation in the record for this discrepancy between the total amount reported on the Form 941 and the total amount reported on the Form 940. ICT's corporate return for 1977 was selected for audit. During the initial interview with the internal revenue agent, Spraggins stated that he gathered the information for that return but that his wife, Willie Spraggins, wrote the figures on the Form 1120. Spraggins gave the agent copies of his customer ledger cards. When the gross receipts figures on the ledger cards were later added up, they greatly exceeded the gross receipts figure reported on the 1977 return. Spraggins then stated that he must have just added up the figures *561 on the front of the ledger cards. The audit was expanded to include the 1976 year, and the case was referred to the Criminal Investigation Division of the Internal Revenue Service. Ultimately Spraggins was indicted, tried, and convicted under section 7206(1) for willfully filing false corporate returns for 1976 and 1977, false as to the gross receipts reported therein. During the criminal trial Spraggins testified that he had determined gross receipts for 1976 by taking the direct labor costs from the Form 941 and dividing it by .70 on the theory that he marked up his direct labor costs by an amount of 30 percent. The costs of goods sold (in the form of direct labor costs) reported on the 1976 corporate return ($ 151,739) divided by .70 produces a figure of $ 216,770, the gross receipts reported on the 1976 return. However, the direct labor costs actually reported on both the Form 941 and Form 940 for 1976 was $ 174,323.97. Spraggins was aware that the total taxable wages reported on Form 941 would not include the wages paid to exempt employees and that if he used that figure, both the exempt wages and the gross receipts from the Harrison Street office would be omitted from *562 the tax return. At the trial in the Tax Court, Spraggins tried to blame one of the women working at the Michigan Avenue office for the understatement of gross receipts on the 1977 return. The record shows that that employee simply added up information Spraggins gave her to add up, and that she, unlike Spraggins himself, had no knowledge of the gross receipts and the direct labor costs generated by the Harrison Street office. See n.10, supra. During the audit and during the criminal trial, Spraggins never suggested that ICT's direct labor costs were understated on the 1976 and 1977 corporate returns. This issue was first raised in the Tax Court. At the trial petitioner also claimed that it had net operating loss carryovers and carrybacks to the years 1976 and 1977. There is no competent, probative evidence in the record to establish that petitioner is entitled to any such carryovers or carrybacks. [12]
*563 ULTIMATE FINDINGS OF FACT 1. ICT had gross receipts of at least $ 321,381.29 for 1977. 2. ICT's costs of goods sold (in the form of direct labor costs) were $ 221,794.23 for 1976 and $ 102,530.16 for 1977. 3. ICT, acting through its sole shareholder and president and treasurer, James P. Spraggins, willfully omitted substantial portions of its gross receipts from its corporate tax returns for 1976 and 1977. 4. ICT underpaid its Federal corporate income tax for each year and such underpayments were due to fraud. OPINION This is a fraud case with the normal split burden of proof. Petitioner must prove by a preponderance of the evidence any errors in the deficiency determinations, and respondent must prove by clear and convincing evidence the elements of fraud. Zack v. Commissioner, 692 F.2d 28 (6th Cir. 1982), affg. a Memorandum Opinion of this Court, cert. denied 460 U.S. 1084 (1983); Sec. 7454(a); Rule 142(a) and (b). I DEFICIENCY DETERMINATIONS As to the deficiency determinations, petitioner primarily challenges (1) the amount of gross *564 receipts for 1977 and (2) the costs of goods sold (in the form of direct labor costs) for both 1976 and 1977. Because of a total failure of proof, two other issues do not warrant further discussion. See nn.11, 12, supra. A. Gross Receipts for 1977
The parties have stipulated that ICT had gross receipts of at least $ 331,529.47 for 1976 and at least $ 303,118.35 for 1977. Both parties now accept the $ 331,529.47 figure for 1976. Petitioner complains because respondent will not accept the "at least $ 303,118.35" as being the amount for 1977, accusing respondent of "deceptive sleight-of-hand playing with numbers" and complaining that respondent seeks to use the highest figure for each year. However, petitioner tries to add the various combinations of figures together for the two-year period and essentially argues that the minimum is the maximum. The problem is that different evidentiary materials in the record produce different combinations of figures. The notice of deficiency determined total gross receipts of $ 312,545.54 for 1976 and $ 323,633.18 for 1977. The customer payment checks for which copies were obtained in the criminal tax trial showed gross *565 receipts of $ 312,545.54 for 1976 and $ 321,381.29 for 1977. The customer ledger cards showed gross receipts of $ 289,440.15 for 1976 and $ 330,919.78 for 1977, and it is this latter figure that respondent seizes upon and that petitioner complains about. The customer invoices showed gross receipts of $ 331,529.47 for 1976 and $ 303,118.35 for 1977. These customer invoices furnished the basis for the parties' "at least" stipulated figures. However, the Court cannot read "at least" as meaning "at most," as petitioner seems to be suggesting. Also petitioner would ignore the most probative evidence in the record, the evidence as to the amounts shown by the customer payment checks. Copies of customer payment checks in the amount of $ 321,381.29 were obtained for use in the criminal trial. This establishes, and the Court has found as a fact, that petitioner had gross receipts of at least $ 321,381.29 for 1977. As to the difference between the "at least $ 321,381.29" figure the Court has found and the $ 323,633.18 amount in the statutory notice of deficiency, petitioner has failed to carry its burden of proof. [13]Welch v. Helvering, 290 U.S. 111, 115 (1933). *566 B. Costs of Goods Sold (in the Form of Direct Labor Costs)
Petitioner first sought to prove direct labor costs by multiplying the number of hours worked by the minimum wage rates in effect for those years. While the number of hours worked is undisputed, there is no persuasive, probative evidence that petitioner in fact paid the minimum wage rate to its temporary day laborers. If anything, there is evidence that it did not pay the minimum wage rate to those employees. See n.2, supra. The record simply does not establish the wage rate that petitioner paid its temporary day laborers. While there is ample evidence as to what ICT's customers (the companies which used the services of these temporary workers) paid ICT for their *567 services, the record is singularly devoid of evidence as to what ICT itself paid them. Petitioner's entire argument on this wage rate issue rests upon the wholly unsupported self-serving testimony of Spraggins whom the Court did not find to be a credible witness. Also petitioner's hours-times-minimum wage rate approach produces a wholly unreasonable and inflated direct labor cost figure for 1976. Petitioner's claimed direct labor cost of $ 340,996.13 is more than its gross receipts for the year and over $ 119,000 more than the wages paid by check totaling $ 221,794.23. The record does not establish that petitioner had cash available to pay wages in cash or made more than just a few wage payments in cash. Spraggins did not keep cash on hand. He in fact made arrangements for various bars and other local businesses to cash the ICT payroll checks. Even if the temporary cash infusions by Spraggins and his wife had been used for cash wage payments (and there is no indication that they were), that would amount to no more than $ 22,500. Actually $ 17,500 of the $ 22,500 was deposited into the payroll bank accounts and $ 5,000 was deposited into the general corporate bank account. *568 Petitioner's argument lacks evidentiary support. Moreover, that argument produces the anomalous result that for 1977 petitioner claims direct labor costs of only $ 93,875.09, whereas the parties have stipulated that ICT made wage payments by check in the amount of $ 102,530.16 that year. Petitioner's alternate theory is based upon the stipulated payroll check amounts plus some undetermined amount of cash payments. Again petitioner's theory lacks evidentiary support as to any cash payments. At the beginning of the second day of trial, the parties stipulated that ICT paid wages by payroll checks in the total amounts of $ 221,794.23 for 1976 and $ 102,530.16 for 1977. However, any wage payments in cash were few and in nominal amounts. There is no basis in the record on which the Court could make even a "guesstimate" as to the amount of any such cash wage payments. Accordingly, the Court declines to make any estimate under the Cohan rule because any such estimate would be mere "unguided largesse." Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). [14]
*569 On this record, the Court concludes that petitioner's costs of goods sold (in the form of direct labor costs) amounted to $ 221,794.23 for 1976 and $ 102,530.16 for 1977. II FRAUD ADDITION Respondent has the burden of proving by clear and convincing evidence the elements of fraud for the section 6653(b) addition to tax. Sec. 7454; Rule 142(b); Zack v. Commissioner, supra. The two elements are (1) the existence of an underpayment of tax each year and (2) that some part of that underpayment of tax each year was due to fraud. Fraud is actual, intentional wrongdoing, and the intent is the specific purpose to evade a tax believed to be owing. Candela v. United States, 635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the *570 collection of such taxes. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud is a question of fact to be determined on the basis of the entire record. Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964), rehearing denied 389 U.S. 912 (1967). However, fraud can seldom be proved by direct proof of the taxpayer's intention, and therefore fraud must be determined from the taxpayer's entire course of conduct and can, and usually must, be proved by circumstantial evidence. Spies v. United States, 317 U.S. 492 (1943); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). *571 This and other courts frequently list various factors or "badges of fraud," but such lists of various kinds of circumstantial evidence from which fraudulent intent can be inferred are nonexclusive. Bradford v. Commissioner, supra;Meier v. Commissioner, 91 T.C. 273, 297-298 (1988). The fact finder must weigh all of the evidence of record, and not merely check off the presence or absence of the various possible kinds of circumstantial evidence. Here the taxpayer, ICT, is a corporation and the requisite fraudulent intent must be found in the acts of its officers and shareholders. American Lithofold Corp. v. Commissioner, 55 T.C. 904, 925-926 (1971); Benes v. Commissioner, 42 T.C. 358, 382 (1964), [15] affd. without opinion 355 F.2d 929 (6th Cir. 1966), cert. denied 384 U.S. 961 (1966); Ace Tool & Eng., Inc. v. Commissioner, 22 T.C. 833, 843 (1954). In this instance, our inquiry is narrowly directed, since James P. (Perry) Spraggins (hereinafter Spraggins) at all times was the sole shareholder, president, and treasurer of ICT. He was also the only individual who performed *572 management functions for ICT. Here there can be little dispute as to the existence of an underpayment of tax each year. ICT concedes, as it must, that it understated its gross receipts on its 1976 and 1977 corporate tax returns. It reported gross receipts of $ 216,770 and $ 116,926 for 1976 and 1977, respectively. Its gross receipts those years were at least $ 331,529.47 for 1976 and at least $ 321,381.29 for 1977, representing omissions of gross receipts of at least 34.6 percent and 63.6 percent, respectively, for those years. ICT also understated its costs of goods sold (in the form of direct labor costs) for each year. ICT reported direct labor costs of $ 151,739 and $ 74,026 for 1976 and 1977, respectively, whereas its direct labor costs were $ *573 221,794.23 and $ 102,530.16, for those respective years. In other words ICT failed to report 31.5 percent of its direct labor costs for 1976 and 27.8 percent for 1977. For 1976 the percentage of direct labor costs omitted was roughly the same as the percentage of gross receipts omitted; for 1977 the percentage of direct labor costs omitted was substantially less than the percentage of gross receipts omitted. For both years, there were substantial omissions of taxable income and substantial underpayments of tax. As to ICT's intent in regard to these underpayments of tax, we start with the fact that ICT willfully filed false corporate tax returns for 1976 and 1977, false as to the gross receipts reported therein. Spraggins was convicted under section 7206(1) of willfully filing false corporate tax returns for 1976 and 1977, false as to the gross receipts reported therein. While intent to evade tax is not an element of the crime under section 7206(1), Spraggins (and hence ICT) is collaterally estopped to deny that he (it) intentionally filed false corporate tax returns for those years. Meier v. Commissioner, supra , 91 T.C. at 282-286; Wright v. Commissioner, 84 T.C. 636, 643-644 (1985); *574 Castillo v. Commissioner, 84 T.C. 405, 409-410 (1985). While this conviction for willfully filing false corporate returns is not conclusive as to the fraud addition, it is still a factor to be considered. ICT also must concede that it understated its gross receipts by substantial amounts, resulting in substantial understatements of its taxable income, as discussed above in connection with the underpayments of tax. ICT reported on its tax returns only nominal amounts of taxable income -- $ 55 for 1976 and $ 1,374 for 1977. Its correct taxable income for those years was over $ 54,000 for 1976 and over $ 180,000 for 1977, resulting in substantial underpayments of tax each year. A pattern of consistent and substantial understatement of income is, by itself, strong evidence of fraud. Cefalu v. Commissioner, 276 F.2d 122, 129 (5th Cir. 1960); Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). *575 Here there is such a pattern. Moreover, Spraggins not only understated ICT's gross receipts and taxable income, but also those of Perry's Barbecue. See n.9, supra. We think these understatements were not accidental but intentional. We note that Spraggins, for example, had one of the ICT staff members determine certain "accounts receivable," amounts billed to ICT's customers in 1976 but not paid by those customers until 1977. ICT was a cash basis taxpayer. Spraggins failed to report those "accounts receivable" for either 1976 or 1977. Often the courts point out that failure to maintain proper books and records is another indicium of fraud. Bradford v. Commissioner, supra, 796 F.2d at 307-308; Lollis v. Commissioner, 595 F.2d 1189, 1192 (9th Cir. 1979), affg. a Memorandum Opinion of this Court. The present case presents a variation of that theme. Petitioner points to the fact that no sales journal, cash receipts and disbursements journal, or general ledger were maintained by ICT, apparently suggesting that Spraggins was just a small businessman *576 whose recordkeeping system proved to be inadequate when business suddenly picked up with the BES contract in 1976. These arguments miss the mark. Spraggins was an experienced businessman, having organized and managed various small companies since 1954. ICT's records, while not sophisticated, were not inadequate per se. The customer ledger cards contained the amounts billed to ICT's customers and those customers' payments to ICT, and hence contained the information as to ICT's gross receipts. Similarly, ICT paid its temporary employees, both clerical and day laborers, primarily by check, and ICT's two payroll bank accounts showed the direct labor costs. What is significant here is not the absence of adequate books and records, but the failure to use information that was readily available to Spraggins. Rather than using the direct evidence of ICT's gross receipts and wages, Spraggins used a method or methods that understated gross receipts, taxable income, and taxes. The Court is satisfied that Spraggins did this to evade taxes. Spraggins has so often changed his story about the preparation of the returns that the Court cannot determine which version is correct. The Court closely *577 observed Spraggins on the witness stand, and found him to be generally evasive, nonresponsive, and ever-changing in his explanations. The Court concludes that much of his testimony was sheer fabrication, and that he would say whatever he thought at the moment would help him. If, for example, Spraggins determined gross receipts for 1976 by taking the direct labor costs from the Form 941 (taxable wages) and dividing it by .70 (on the theory that he marked up direct labor charges by 30 percent), he knew that that would result in the omission of the gross receipts and wages from the Harrison Street office, or at least those pertaining to the "exempt" workers. If, for example, Spraggins determined gross receipts in 1977 by having LaVerne Benbenek add up certain figures, he knew that she did not know about the gross receipts and the direct labor costs of the Harrison Street office. He also knew that, at his direction, she was excluding all of the amounts billed to customers in 1976 but not paid to ICT until 1977. By whatever method Spraggins in fact concocted the figures in the corporate tax returns for 1976 and 1977, he knew he was omitting substantial portions of ICT's business, primarily *578 the portion involving the day laborers which he personally and alone handled. Another example of Spraggins' ignoring information that was readily available is the matter of ICT's cash on hand. The December bank statements for ICT's three bank accounts showed cash on hand at the end of 1976 of $ 24,165.34 and at the end of 1977 of $ 185,891.87. Spraggins alone handled banking matters for ICT. Only he was authorized to write checks on these accounts. On the tax returns, which he signed under penalties of perjury, he reported cash at the end of 1976 of $ 8,626 and at the end of 1977 of $ 8,167.50. The Court is satisfied that he falsified these cash-on-hand figures in order to conceal his omissions of substantial amounts of taxable income each year. Based on the record as a whole, the Court concludes that respondent has sustained his burden of proof and has established fraud on the part of ICT by clear and convincing evidence. To reflect the above holdings and the concessions, Decision will be entered under Rule 155. Footnotes
1. Petitioner has conceded the amount of gross receipts for 1976 in the amount of at least $ 331,529.47 and at least $ 303,118.35 for 1977; interest income for both years; bad debt expense adjustment for both years; consultant fee adjustment for both years; insurance adjustment for 1977; IRS penalty (tax) adjustment for 1977; depreciation for 1977; and bank charges for both years. There was another adjustment in the notice of deficiency (adjustment 1(c)), increasing taxable income for 1977 by the amount of $ 13,677.94. Apparently this item in regard to compensation of officers is either subsumed in the cost of goods sold (in the form of direct labor costs) item or otherwise settled by the parties. Both parties, in their respective computations on brief, allow a deduction of $ 4,688 for compensation of officers, as claimed on ICT's 1977 corporate return (Form 1120, 1. 12).↩
2. In the opening statement and during the first day of this trial, petitioner's theory was that the invoices sent to ICT's customers (the employers) showed the number of hours worked and that the number of hours worked multiplied by the $ 2.30 minimum wage rate would show ICT's direct labor costs for the day laborers. The record does not establish that ICT paid the minimum wage rate of $ 2.30 per hour to these day laborers, as petitioner contends. In fact, in the one instance where the hours worked and amount paid can be traced for a particular day laborer, the worker was paid $ 1.81 per hour. In that one instance the day laborer was paid by check. It would be sheer baseless speculation to say that the day laborers and particularly those paid in cash were paid $ 2.30 per hour. There is no evidence to support such a contention, except Spraggins' vague, generalized, and wholly self-serving testimony that the Court did not find to be credible.↩
3. On the second day of the trial, petitioner advanced a new theory, arguing that ICT's total direct labor costs were the total amounts from the two payroll bank accounts, to which the parties have now stipulated, plus some undetermined amount of cash payments. This second theory is also lacking in evidentiary support as to any cash payments.↩
4. The record contains a lot of discussion to the effect that ICT marked up its direct labor costs by an amount of 20 to 25 percent or 30 percent. However, the few contracts in evidence show that there was a specific contract price that the customer agreed to pay for different categories of temporary employees. Spraggins may well have used some rough rule of thumb in trying to negotiate prices with ICT's customers, perhaps aiming for an amount from 20 to 30 percent above ICT's direct labor costs. However, the Court is satisfied that the customers had a set price for a particular type of employee and did not merely pay ICT's direct labor cost plus some percentage markup.↩
5. ICT did not maintain any sales journal, cash receipts and disbursements journal, or general ledger.↩
6. There is no evidence that any additional customer ledger cards were ever maintained at the Harrison Street office, and if any had been maintained at the Harrison Street office, it would mean that there would be an even greater amount of gross receipts omitted from ICT's corporate tax returns each year. However, actual payments from ICT's customers somewhat exceeded the amounts shown by the customer ledger cards, so there may have been a few missing customer ledger cards or perhaps a failure to post some of the invoice and payment amounts on the ledger cards.↩
7. Only the payroll journal for 1977 is in evidence. The payroll journal for 1976 was possibly destroyed in a fire or possibly was never returned to Spraggins by his attorney in the criminal tax case. The Court is satisfied that there was a payroll journal for 1976 in existence at one time. However, the record does not establish that the missing payroll journal was one for just the Harrison Street office and for just the day laborers.↩
8. On the contrary, the indications are that ICT had repaid all of those funds before the end of 1976. The 1976 corporate tax return reflected loans from shareholders of $ 15,000 at the beginning of the year and of only $ 10,000 at the end of that year. Also ICT made loans to Perry's Barbecue that year.↩
9. There is no evidence that any of ICT's corporate funds were diverted to Spraggins. However, ICT was making loans to Perry's Barbecue. This case does not involve either the corporate tax liability of Perry's Barbecue or the individual tax liability of Spraggins. There is no contention in this case that Spraggins received constructive dividends from ICT for either year before the Court. Since the tax liability of Perry's Barbecue is not in issue in the case, the Court sustained petitioner's objection to testimony about the understatement of its gross receipts. However, the parties had stipulated into evidence the original and amended corporate returns of Perry's Barbecue. Those returns show that the gross receipts were understated, and that after the criminal investigation began, Spraggins filed amended corporate returns for Perry's Barbecue, increasing the gross receipts. Those facts are relevant here only as to pattern of conduct and fraudulent intent.↩
10. By whatever method the figures that appeared on the corporate tax returns were concocted, it is clear that to the extent that any of the ICT staff assisted Spraggins, the staff member was merely adding up the data he told her to add up. Only Spraggins knew about the gross receipts and direct labor costs generated by the Harrison Street office, and that information was not included in the data that LaVerne Benbenek was given to work with. Also when she was told to add up 1977 gross receipts from certain customer invoices, Spraggins told her to exclude the amounts billed in 1976 but not paid until 1977. Spraggins omitted those "accounts receivable" from both the 1976 and 1977 corporate returns.↩
11. With the concessions set out in n.1, supra↩, the parties now agree that petitioner is entitled to total business expense deductions of $ 55,751.69 for 1976. With those concessions for 1977, they agree to total business expense deductions of at least $ 31,395.07 for 1977. However, petitioner now claims an additional amount of FICA tax of $ 2,107.19 that was not deducted on its 1977 return. However, petitioner has not proved that it in fact paid that additional amount in 1977.
12. The only evidence proffered by petitioner was its corporate tax returns from prior and subsequent years. Some of those tax returns were stipulated into evidence by the parties; some of those tax returns were offered into evidence at the trial and the Court refused to receive them because tax returns are not self-proving. The Court explained to petitioner that tax returns are merely statements of the taxpayer's claim and do not establish the truth of the facts and figures contained therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051↩ (1957). Nevertheless, petitioner offered no independent evidence of the claimed operating losses, proffering only the tax returns for whatever "weight" the Court would accord them. As the Court advised petitioner on the record, the Court accords them no weight at all, particularly when the sole shareholder, president, treasurer, and only manager of ICT (Spraggins) has been convicted of willfully filing false corporate tax returns.
13. Some of the dispute as to gross receipts for 1977 may be misdirected. While respondent argues for the gross receipts figure of $ 330,919.78 for 1977, respondent on brief concedes the difference between the $ 330,919.78 and the $ 323,633.18 amount in the deficiency notice.↩
14. Also any appeal in this case will lie to the United States Court of Appeals for the Seventh Circuit, which has stated that the present trend is not to invoke the Cohan rule in cases where business records could and should have been maintained but were not. Lerch v. Commissioner, 877 F.2d 624, 627-629 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Pfluger v. Commissioner, 840 F.2d 1379, 1386 (7th Cir. 1988), affg. T.C. Memo. 1986-78↩.
15. Another holding in the Benes case in regard to constructive dividends has been overruled by this Court in Truesdell v. Commissioner, 89 T.C. 1280, 1301 (1987). That is unrelated to the principle for which Benes↩ is cited herein.